## THE GERMAN NATIONAL BANK OF CHICAGO
### v.
## ROBERT MEADOWCROFT.

1. STATEMENT.—Appellant, to secure a previous existing indebtedness, took by conveyance a warehouse, or elevator, used for storing grain, entered into possession, and began the business of receiving and storing grain, and giving receipts therefor. At the time appellant went into possession, appellee held a warehouse receipt of a former custodian, for about 6,000 bushels of barley actually stored in the elevator, but mixed with other grain of the same quality. On demand, appellant refused to deliver the grain covered by appellee's receipt.

2. NATIONAL BANKS—POWER TO HOLD REAL ESTATE—CONDUCTING WAREHOUSE BUSINESS.—Even admitting, as claimed by appellant, that carrying on a warehouse business by a National Bank is *ultra vires*, the bank had power to take the elevator as security for its debt, and with it also came the power to do every act necessarily incidental thereto, and in taking possession of the elevator, it came into the lawful possession of the grain stored therein, and it was its duty to hold the grain of which it had come into possession, for those who were entitled to receive it. The bank having refused to deliver a portion of the grain in store on demand of the party entitled thereto, it is no defense to an action of trover to say that it parted with the possession in the course of a business enterprise on which it had no legal power to embark, and it must be held liable for the conversion thereof by its agents.

3. WAREHOUSEMAN A MERE BAILEE—TROVER.— The warehouseman is the mere bailee or custodian for the owner, and the grain stored is the property of the person holding the warehouse receipts. The grain represented by the receipts need not be the identical grain stored, but as the mass of grain on hand is changed by successive storages and shipments, the title of the holder of such receipts passed by operation of law to that which remained in store, and he was empowered at any moment to assert such title by requiring a delivery to himself of the grain, and an action of trover would lie for a wrongful conversion. The design of this action is to recover damages for the conversion, not to recover the thing in specie.

ERROR to the Circuit Court of Cook county; the Hon. JOHN G. ROGERS, Judge, presiding. Opinion filed December 8, 1879.

Messrs. TENNEY & FLOWER, for plaintiff in error; argued that corporations can exercise only such powers as are expressly conferred, and such implied powers as are necessarily incident thereto; and cited 2 Abb. Dig. 706; Vandall v. San Francisco

Dock Co. 40 Cal. 83; Bellmeyer v. Ind. Dist. of Marshalltown, 44 Iowa, 564; Wheeler v. First Nat. Bank, 42 Md. 581; St. Louis v. Weber, 44 Mo. 547; Matthews v. Skinner, 62 Mo. 329.

Corporations are not liable for the unauthorized acts of their officers, though done *colore officii:* Angell & Ames on Corporations, § 311; 2 Dillon on Municipal Corporations, 877; Chicago v. Turner, 80 Ill. 419; Board of Trustees v. Schroeder, 58 Ill. 353; Horn v. Mayer, etc., 30 Md. 218; Eastman v. Meredith, 36 N. H. 278; Mayer v. Cureliff, 2 Comst. 165; Weckler v. First Nat. Bank, 42 Md. 581; First Nat. Bank v. Citizens Nat. Bank, 21 Int. Rev. Rec. 382; Ind. etc. R'y Co. v. Anthony, 43 Ind. 183; Brokaw v. N. J. R. R. Co. 32 N. J. L. 328; Wiley v. First Nat. Bank, 41 Vt. 456; Hood v. N. Y. & N. H. R. R. Co. 22 Conn. 502; First Nat. Bank v. Ocean Nat. Bank, 60 N. Y. 278; Scott v. Nat. Bank, 72 Pa. St. 471; De Haven v. Kensington Nat. Bank, 81 Pa. 95; Vanderbilt v. Richmond Turnpike Co. 2 Comst. 479; Sturges v. Keith, 57 Ill. 451.

Corporations organized under the National Banking Act can carry on banking business only: U. S. Rev. Stat. § 5136.

The action of trover will not lie in this case: Low v. Martin, 18 Ill. 290; Davidson v. Waldron, 31 Ill. 120.

Where grain has been stored in a warehouse, mixed with other grain, the owner has parted with his property and the receipt issued to him does not represent his grain: Bailey v. Bensley, 87 Ill. 556; Seymour v. Wyckoff, 10 N. Y. 213; Chase v. Washburn, 1 Ohio St. 244; Newton v. Woodruff, 2 Comst. 153; Hurd v. West, 7 Cow. 752; Ewing v. French, 1 Blackf. 353; Smith v. Clark, 21 Wend. 83; Buffum v. Merry, 3 Mason, 478; Lonergan v. Stewart, 55 Ill. 44; Rahilly v. Wilson, 3 Dillon, 420; Johnson v. Brown, 37 Iowa, 200.

Messrs. Barker, Buell & Barker, for defendant in error; contending that the bank is liable for acts of its officers where the corporation availed itself of the benefit of such acts, cited St. L. A. & C. R. R. Co. v. Dalby, 19 Ill. 353; Wolf v. Boettcher, 64 Ill. 316; Angell & Ames on Corporations, 310; 2 Hilliard on Torts, 322.

A national bank may purchase and hold real property as security for pre-existing indebtedness: Union Nat. Bank v. Mathew, 11 Chicago Legal News, 287, U. S. Rev. Stat. § 5137.

The warehouse receipt is a contract of bailment, and the relation of the holder and warehouseman is that of bailor and bailee: Broadwell v. Howard, 77 Ill. 305; Cool v. Phillips, 66 Ill. 216; Young v. Mills, 20 Wis. 615; Kimberly v. Patchin, 19 N. Y. 330; Lickbarrow v. Mason, 1 Smith's Lead. Cas. 1,197.

Trover is the appropriate action; it is concurrent with trespass: 1 Chitty's Pl. 148; Jackson v. Anderson, 4 Taunt. 24; Cool v. Phillips, 66 Ill. 216; Broadwell v. Howard, 77 Ill. 305; Burton v. Curyea, 40 Ill. 320; Leonard v. Dunton, 51 Ill. 482; Whitehouse v. Frost, 12 East, 614; Gardner v. Dutch, 9 Mass. 427; Woodley v. Coventry, 2 H. & C. 164; Kimberly v. Patchin, 19 N. Y. 336; Hurff v. Hires, 18 Am. Law Reg. 161.

BAILEY, P. J. This was an action of trover, brought by Robert Meadowcroft against the German National Bank of Chicago, a banking association incorporated under the National Bank Act, and Henry Greenebaum, Herman Schaffner, Albert M. Day and William H. Stokes, officers and agents of said bank, to recover damages for the alleged conversion by the defendants of six thousand and four and eighty one-hundredths bushels of barley, the property of the plaintiff, of the value, as averred in the declaration, of $8,000. All of the defendants appeared and pleaded not guilty, and on the trial in the court below, the jury found the German National Bank guilty, and assessed the plaintiff's damages against it at $3,134, and also found the other defendants not guilty.

The evidence shows that on the 10th day of July, 1876, one Eben F. Runyan, for the purpose of securing a previously existing indebtedness from him to the said bank, conveyed to said Herman Schaffner, its cashier, in trust for the bank, a certain public grain warehouse in Chicago, known as " Runyan's elevator," and that on or about the first day of November, 1876, said bank, through defendants, Greenebaum, Day and Stokes, as its agents, took possession of said warehouse.

At the time possession was so taken, the plaintiff held warehouse receipts for the grain in controversy, issued by former custodians of the warehouse. These receipts were issued for grain actually stored therein, and each contained an agreement on the part of the holder that the grain therein mentioned might be stored with other grain of the same quality by inspection. It is conceded that the grain in question, on being stored, was actually mixed with other grain of like quality, so that its identity became lost, but the evidence shows that at the time the bank took possession, there remained in the warehouse a sufficient amount of barley of the proper grades to cover all the warehouse receipts for barley in store then outstanding. The bank, on taking possession, employed said Stokes to superintend and take charge of the warehouse, and he at once commenced to receive grain, and to put the same into bins with the other grain then in store, issuing warehouse receipts therefor, and to deliver grain from said warehouse. In December following plaintiff tendered to said Stokes, at the warehouse, the charges due for storage, and demanded of him the barley represented by his receipts. Delivery thereof being refused, this suit was brought.

It is urged that upon the facts thus disclosed by the record, the judgment cannot be sustained. In support of this position two propositions are submitted, viz:

1. The business of carrying on a public grain warehouse is not within the powers delegated to national banks, and all acts done by such corporation in attempting to carry on such business are *ultra vires*, and the corporation cannot be held responsible for a tortious act of its agent committed in the pursuit of such unauthorized business.

2. Trover cannot be maintained for the conversion of grain which has, by the consent of the owner, been mixed with other grain of like character, so as to have lost its identity.

As to the first of these propositions, it may be said that, admitting the assumption that carrying on the business of a warehouse by a national bank is *ultra vires*, the conclusion sought to be deduced therefrom in the present case does not seem to follow. We do not deem it necessary to discuss the general

doctrine of the liability of private corporations for torts committed by their agents while engaged in enterprises not within the corporate authority. Here, whatever may have been the corporate power of the bank to carry on the warehouse business, it cannot be doubted that in taking possession of the warehouse it came into the lawful possession of the grain in store therein. By the national bank act, national banking associations are authorized to take and hold real estate as security for or in payment of debts previously contracted in the course of their dealings, and included in such authority is, of course, the power to take and hold the possession of the real estate thus acquired. The power of the German National Bank to receive from Runyan a conveyance to itself, or to a trustee for its use, of said warehouse, as security for or in satisfaction of a debt previously contracted, is not and cannot be denied. Nor can it be doubted that it had legal authority, after obtaining such conveyance, to take and hold possession of the property conveyed. This power to acquire and take the title and possession of the warehouse, carried with it the power to do every act necessarily incidental thereto.

When the bank took possession, the barley in question was in the warehouse in store. Taking possession of the one necessarily involved taking possession of the other. The grain had been placed in the building under and in pursuance of the provisions of the statute, and warehouse receipts issued, which were then outstanding. No person, not even the bank, had legal authority to remove it, except upon return and surrender of the receipts. The previous custodian could not do it. They were forbidden by the statute to remove it, except to preserve it from fire or other sudden danger, under pain of imprisonment in the penitentiary. Under the circumstances, it became, for the time being, in a certain sense, a legal accessory to the building, and possession of the former followed as a necessary incident to the possession of the latter. The bank, then, in taking possession of the warehouse, as it had a right to do, came also into the lawful possession of the grain.

While it may be true that the bank had no authority to receive other grain in store, issue warehouse receipts, and

German Nat. Bank of Chicago v. Meadowcroft.

embark generally in the warehouse business, it was its duty to hold the grain of which it had come into the lawful possession, for those who were entitled to receive it. It had, in the exercise of its statutory powers, become the custodian of the property, and the law cast upon it the duties properly appertaining to that relation. Section 5 of the statute in relation to public warehouses expressly authorizes occupants of such warehouses to deliver property previously stored therein, without obtaining a license as a public warehouseman. The bank having refused to deliver a portion of the grain in store, on demand of the party entitled thereto, it is no answer to an action of trover to say that it parted with the possession in the course of a business enterprise on which it had no legal power to embark. It is quite immaterial how it may have disposed of the grain, whether in a lawful or an unlawful business, the liability to the true owner is the same in either case. By way of illustration, suppose the bank had used the money of its depositors in a mercantile enterprise, or in building and operating railroads or steamboats, manifestly, it would not be permitted to urge as a defense to the depositors' demand for re-imbursement, that the money had been squandered by its agents in a business in which it had no legal power to engage. So here, the bank, having come into the rightful and legal possession of the grain, it must be held liable for the conversion thereof by its agents, whether the precise business in which the conversion took place was *ultra vires* or not.

In considering the second proposition submitted by the learned counsel for the bank, it is important, in the first place, to determine who held the legal title to the grain while in store. It is insisted that, by consenting to have it mixed with other grain of like grade, the holder of the warehouse receipts lost all property in the grain itself, and that the receipt is not evidence of title to the grain, but only a mere personal undertaking or promise of the warehouseman to deliver to the holder a like quantity of grain of the same grade on demand and return of the receipt. This is upon the theory that the delivery of grain to a public warehouse, to be stored with other grain, is, in substance and reality, a sale of the grain to the warehouseman,

and like the case of a deposit of money in a bank, only establishes the relation of debtor and creditor between the parties.

It would certainly involve consequences which the commercial public has not anticipated, if it should be held that upon a storage of grain in a public warehouse the property therein passes to the warehouseman and becomes liable to execution for his debts, and subject to such disposition by him as an owner may make of his own property. The use of public warehouses, which, as the produce business of the country is now organized, has become a necessary and unavoidable concomitant to the transportation of grain to market, would thereby be rendered exceedingly precarious. Warehouse receipts, instead of representing and evidencing the title to actual grain, would be but the mere promissory notes of the warehouseman, and depending for their value entirely upon his individual responsibility and credit.

That such, however, is not the real nature of the transaction, is, we think, established, not merely by the foregoing considerations *ab inconvenienti*, but by fair inferences to be drawn from the statute regulating public warehouses. By said statute, the warehouseman, who at common law exercised a mere private employment, is constituted a *quasi* public officer. Before transacting any business in his warehouse he is required to obtain a license from the proper public authority, and give a bond for the faithful discharge of his duties. The manner of receiving, storing and delivering grain, of executing and cancelling warehouse receipts; and, in general, the rules upon which the entire business is to be transacted, are prescribed and regulated by the statute, and severe penalties are imposed for their violation. These provisions are all inconsistent with the assumption that the warehouseman acquires the ownership of the grain stored in his warehouse. He is restrained from exercising over it any of the powers which ordinarily appertain to the ownership of property. He cannot sell or dispose of it, and the mere removing of it from store, except to preserve it from fire or other sudden danger, is made a felony, and punished accordingly. If the grain becomes damaged by heating or other cause beyond his control, in case he has used reason-

able care and diligence in protecting and preserving it, the loss falls upon the holder of the receipt, and not upon him. In these and many other particulars, which will be readily noticed on examining the statute, there is a clear manifestation of an intention to constitute the warehouseman, not the owner of the grain, but the mere bailee or custodian for the owner. If any implications of a change of ownership arise from the mixing of the grain, so as to obliterate its identity, such implications are all rebutted by these various provisions of the statute which necessarily negative and exclude the idea of property in the warehouseman. Ownership does not exist where every mode by which ownership may be either manifested or made available, is forbidden by law.

But the statute itself, clearly recognizes the principle that warehouse receipts represent and are evidence of title to the grain itself, and not mere promissory notes, payable in grain.

Thus, in section 9, it is provided that, " Where a part of the grain *represented by the receipt* is delivered out of store and the remainder is left, a new receipt may be issued for the remainder." In section 24, it is provided that warehouse receipts " shall be transferable by the endorsement of the party to whose order such receipt may be issued, and such endorsement shall be deemed a valid transfer of the property *represented by the receipt.*" Again, section, 25 makes it a felony to remove any property from store " without a return and cancellation of any and all outstanding receipts that may have been issued to *represent such property.*"

We are referred to the recent case of Bailey v. Bensley et al. 87 Ill. 556, as sustaining a different view from the one we have here taken. It cannot be denied that the opinion in that case contains certain expressions which, if taken by themselves, and apart from the particular questions there involved, would seem to support the proposition that, where grain is received into a warehouse and mixed with other grain of like grade, so as to lose its identity, the owner parts with his property and the receipt taken is not a representative of his grain. That was a suit between a country grain merchant and his consignees or commission men in Chicago. Bailey had shipped

various quantities of grain to Chicago, consigned to Bensley & Wagner, and had drawn upon them for various sums of money, and after a considerable course of dealing of that character, Bensley & Wagner brought suit against Bailey, alleging a balance of account in their favor. It appeared that the grain consigned by the defendant to the plaintiffs was, by the latter, stored in a warehouse in Chicago, and the usual receipts taken, and that the particular receipts taken for the defendant's grain were soon thereafter disposed of by the plaintiffs, although they seem to have kept on hand a sufficient quantity of receipts for grain of the several kinds and grades to represent the aggregate amount of grain received by them from their various consignors, which they had not been ordered by such consignors to sell. The defendant sought to charge them with the sale of his grain at the time when and the price at which they actually disposed of the specific receipts obtained therefor at the time of its consignment, claiming that the plaintiffs were bound to retain for him the specific receipts obtained for his grain. The plaintiffs, however, were permitted to show that it was the usage and custom of business on the Board of Trade to pay no regard to the identity of receipts, except when sales were made, to endeavor to get rid of the oldest receipts first, and retain the more recent ones, and thus keep on hand a sufficient amount of receipts to cover all grain in their hands remaining unsold. The question was whether, as between consignor and commission merchant, the former had the property in the specific receipt obtained for his grain, or whether the duty of the commission merchant was not performed by keeping on hand a sufficient amount of receipts of the proper kind and grade. The court held that, as between said parties, dealing in view of the custom on the Board of Trade, the consignor lost his property in the specific receipt obtained for his grain. No question arose as to the rights of the warehouseman, nor did the court undertake to decide that, as between him and the party storing the grain, the former acquired and the latter lost the property in the grain.

We think it clear, then, that the grain in question in this suit did not become the property of the warehouseman at the

time it was delivered to the warehouse. The question then arises, to whom did it belong? It would seem to follow, necessarily, that if the warehouseman did not become the owner, the title and property were in the holders of the warehouse receipts. No one else, so far as the record shows, had any interest in it. Undoubtedly the property of the holders of the receipts in the specific grain placed in store, was lost the instant its indentity became incapable of being established. But the grain represented by the receipts need not, necessarily, be the identical grain stored. While the warehouse was being carried on, the grain in store was, of course, constantly changing in its identity, but, at any given moment, the holders of all the outstanding receipts were, aggregately, entitled, on payment of storage, to the delivery of the entire amount in the warehouse. They, at least, as against the warehouseman, were its owners, and their receipts were the evidence of their title. As the mass of grain on hand was changed by successive storages and shipments, their title passed by operation of law to that which remained in store, and they were empowered at any moment to assert such title by requiring a delivery to themselves of the grain.

It is true, the warehouseman, until demand and payment of the storage by the holders of the receipts, was entitled to possession, and so had a qualified property, as bailee or custodian, and such qualified property subsisted as to the portions belonging to each individual holder. Such special property, undoubtedly, invested the warehouseman with all the rights of absolute ownership, except as against the real owner. It becomes immaterial, then, whether we regard the plaintiff and the holders of the residue of the outstanding receipts, or the plaintiff and the warehouseman, as together owning the entire amount of grain in store. In either case, we think, the action of trover will lie against the warehouseman for a conversion of the plaintiff's grain. Such would be the law, even if we were compelled to treat the plaintiff as a mere joint owner with others of an undivided interest in the grain. If the plaintiff and the warehouseman, or, in this case, the bank, which, for all the purposes of this suit, stands in the place of the warehouseman, are to be regarded as the joint owners, the plaintiff is entitled,

under the provisions of chapter 76 of the Revised Statutes, to maintain against the other joint owner an action of trover for its conversion. Benjamin v. Stremple, 13 Ill. 466; Boyle v. Levings, 28 Ib. 314. If, on the other hand, the plaintiff and the holders of the other receipts are to be considered as the joint owners, it is held that, at common law, trover lies for the conversion of an undivided part of a chattel. 1 Chit. Pl. 148. The design of the action is not to recover a thing in specie, but to recover damages for the conversion thereof. 9 Bac. Abridg. Trover, D. In Watson v. King, 4 Camp. 272, the owner of a three-fourths interest in a ship gave to the defendant a power of attorney authorizing him to sell said interest, and before the execution of said power died. The defendant afterwards sold said interest, and in an action of trover brought by the administratrix, Lord Ellenborough said: "An undivided part of a chattel may be tortiously converted to the use of a wrong-doer, and where that is the case, I see no reason why trover may not be maintained by the real owner. No other remedy is suggested." See, also, Hall v. Dean, Crok. Eliz. 841; Walsh v. Adams, 3 Denio, 125; White v. Osborn, 21 Wend. 72; Nowlen v. Colt, 6 Hill, 461; Richtmeyer v. Raymond, 12 Wend. 51; White v. Morton, 32 Vt. 15; Hyde v. Noble, 13 N. H. 494; Stafford v. Ames, 9 Penn. St. 354.

But we do not think that the plaintiff is to be regarded as one of several joint owners of an undivided quantity of grain. His interest was in reality several. He was the owner, not of an undivided portion of the whole, but of a determinate amount, which he had an absolute right to have separated from the residue. In the recent case of Hurff v. Hires, decided by the Court of Errors and Appeals of New Jersey, and published in 18 Am. Law Reg. 161, the court discusses, with great learning and ability, the rights of a purchaser of a given number of bushels of grain from a larger quantity, before the separation of the quantity purchased from the bulk from which it is to be taken, and after considering the question at great length, both in the light of reason and authority, reaches the conclusion that separation from the bulk is not essential to passing the title to the purchaser in the specific grain purchased. If such

are the rights of a purchaser, as against his vendor, the plaintiff, upon principles much more satisfactory and conclusive, is, as against a mere custodian, the owner of the specific grain represented by his warehouse receipts.

The cases are numerous where an owner of a specific quantity of grain or other property of uniform kind and value, with a larger bulk of which it forms a part, may maintain trover for the conversion of the same, although it may never have been separated from the bulk. In Jackson v. Anderson, 4 Taunt. 24, the plaintiff brought an action of trover for the conversion of 1969 Spanish dollars, which he was entitled to receive out of 4718 dollars in the hands of the defendant. The dollars when received by the defendant were in bulk in a barrel, and in that condition were sold by the defendant to the bank of England. The objection being made that trover would not lie, Mansfield, C. J., said: "We think there is no difficulty in that point. The defendant has disposed of all the dollars; consequently, he has disposed of those which belong to the plaintiff; and as all are of the same value, it cannot be a question what particular dollars were his. * * * * If a man keeps all, and has no right to a part, the action lies for that part which he wrongfully detains." In Whitehouse v. Frost, 12 East, 614, trover was maintained for the conversion of ten gallons of oil, a part of forty gallons contained in a cistern. In Woodly v. Coventry, 2 Hurls. & Colt. 164, the plaintiff was the purchaser of a specified number of barrels of flour, forming a part of a larger quantity from which it had not been separated, and on refusal of the defendants to deliver the same, trover was maintained. So in Gillett v. Hill, 2 Crompt. & Mees. 530, the action was sustained where the plaintiff had purchased twenty sacks of flour and received an order from the vendor on his wharfinger, requesting the delivery of the same to the plaintiff. The order was accepted by the wharfinger, but on subsequent demand for the flour a delivery was refused, whereupon trover was brought against the wharfinger. See, also, Knights v. Wiffin, Law Rep. 5 Q. B. 660.

Upon principle, as well as in the light of the foregoing

authorities, we are of opinion that the action of trover was the plaintiff's appropriate remedy in this case. The judgment will therefore be affirmed.

                                    Judgment affirmed.