## SHAWNEE NAT. BANK v. PURCELL WHOLESALE GROCERY CO.

No. 1772. Opinion Filed May 14, 1912.

(124 Pac. 603.)

1. **PRINCIPAL AND AGENT**—Existence of Agency—Sufficiency of Evidence. R., a contractor, being indebted to the bank and having a contract to build bridges, by written instrument to which the bank was also a party, transferred to H. as trustee all of the outfit used in the construction work and authorized him to take charge of the work under the bridge contract, and after paying all costs and expenses of the work, including a salary to himself and ten per cent. to R., to pay the balance received from the bridge contract to the bank, and also authorized him, if the proceeds of the bridge contract did not pay the bank, to sell the outfit and pay R.'s debt to the bank. H. was a director of the bank and the bank induced him to act. The bank held mortgages on R.'s outfit at the time H. was appointed trustee. All payments under the contract were received by the bank. The bank advanced money to be used in carrying on the work. Held, that a finding that H. was acting as agent for the bank was supported by the evidence.

2. **CORPORATIONS**—Powers and Liabilities—Estoppel to Deny Liability. H. bought groceries from plaintiff which were used in carrying out the bridge contract, and the bank received the proceeds of the contract. Held (1) that, though the business of building bridges was ultra vires, the bank, having received through the bridge contract the proceeds of the groceries, is estopped to deny liability for their value; (2) that it is immaterial whether the bank made a profit or sustained a loss from their use.

(Syllabus by Rosser, C.)

*Error from District Court, McClain County;*
*R. McMillan, Judge.*

Action by the Purcell Wholesale Grocery Company, a corporation, against the Shawnee National Bank, a corporation, M. B. Ryan, and B. F. Hamilton, trustee. Judgment for plaintiff, and defendant Shawnee National Bank brings error. Affirmed.

*J. H. Wood* and *J. H. Miley,* for plaintiff in error.

*J. F. Sharp,* for defendant in error.

Opinion by ROSSER, C. This is a suit by the Purcell Wholesale Grocery Company against the Shawnee National Bank,

hereinafter referred to as the bank, M. B. Ryan, and B. F. Hamilton, trustee, to recover the price of some groceries and commissary supplies. Ryan made no defense, and a judgment was rendered against him by default. The other parties waived a jury, and the case, as among them, was tried to the court, who rendered a judgment against the bank in favor of the company, and against the company' in favor of Hamilton. The bank appeals and bases its grounds for reversal upon two propositions: First, that there is no evidence in the case showing that Hamilton acted for the bank. Second, that the bank, being a national bank, had no power to engage in the business of a railroad contractor, and that, if it attempted to carry out the work begun by Ryan, its acts were *ultra vires* and imposed no liability upon it.

The evidence discloses the following state of facts: Ryan was a bridge contractor, and as such, took a contract under the Canadian Valley Construction Co. to build bridges on the Oklahoma Central Railroad. He was indebted to the Shawnee National Bank in a considerable sum of money, and the bank held chattel mortgages on all his construction outfit. The Canadian Valley Construction Co. claimed the right to take possession of Ryan's outfit at any time when necessary to complete the work within the time specified in the contract. In January, 1907, Dorset Carter, the president of the construction company, and Mr. Hand, the chief engineer of the railroad company, went to the office of the bank at Shawnee and informed Mr. Douglas, the president of the bank, that Ryan was not building the bridges fast enough, and that the construction company intended to take charge and complete the work. The contract was represented as a profitable one. It was suggested by some of the parties that the bank take charge and complete the contract. Mr. Douglas stated that the bank could not do that, but said they might be able to find a man who would do that for them. It was then agreed that Dr. B. F. Hamilton should be appointed Ryan's trustee. A written agreement was then executed in which Ryan was described as the party of the first part, the bank as party of the second part, and B. F. Hamilton as trustee for said parties.

The material portions of the contract are as follows:

"That whereas, the said M. B. Ryan is indebted to the said Shawnee National Bank in the sum of $6,341.84, six thousand three hundred forty-one and 84-100 dollars, and whereas, the said M. B. Ryan has a contract dated October 27th, 1905, with the Canadian Valley Construction Co. to construct all bridges on the Oklahoma Central Railway from Lehigh to Ada, Indian Territory, supplemental contract dated June 22nd, 1906, to construct bridges on said railway from the Frisco crossing at Ada to the west end of the Oklahoma Central line of said railway at Chickasha, I. T. Now therefore, in order to further secure the payment of the said indebtedness from the said Ryan to the said bank in addition to certain chattel mortgages heretofore executed by the said Ryan to the said bank, the said M. B. Ryan hereby assigns, transfers and delivers to the said B. F. Hamilton his interest in said contract for the time being and for purposes herein set forth, also assigns all money or moneys now due or held in reserve by the said Canadian Valley Construction Co., also the stock and construction tools, pile drivers, wagons, and all other things used on said bridge construction work, as follows (describing property). The said H. B. Ryan agrees that the said B. F. Hamilton, as trustee, shall take possession of said property and control of all of said construction work and oversee said construction work and make all collections due and to become due from said construction company to said Ryan, and after paying all cost and expense of carrying on said construction work and two hundred fifty dollars per month of the collections, compensation for his own services, and ten per cent. (10%) of the net earnings to the said M. B. Ryan to meet his expenses, the said B. F. Hamilton shall apply the balance collected under said contract to the aforesaid indebtedness of the Shawnee National Bank, and after the same has been fully paid, he, the said B. F. Hamilton, shall re-assign, transfer and deliver said property and interest in said contract to the said M. B. Ryan. It is further agreed and stipulated, by and between said parties, that in the event that the collections made as above set forth are insufficient to pay the above indebtedness of the said M. B. Ryan to the Shawnee National Bank, then in that event it is agreed that the said B. F. Hamilton, as trustee, shall sell all of the above described personal property mentioned and referred to in this contract and apply the proceeds of such sale on the above indebtedness for said Ryan to said bank, and if there shall be any surplus or excess over and above a sufficient amount to discharge said indebtedness out of the proceeds of the sale of said personal property, said overplus shall be paid to the said M. B. Ryan, after

deducting all costs of sale, expenses and compensation to said B. F. Hamilton for his services. Said B. F. Hamilton agrees to retain Charles Hamilton as superintendent of the works at $2,000.00 per annum."

The Canadian Valley Construction Co. then made a contract with Hamilton by which Hamilton was substituted for Ryan in the original contract between Ryan and the construction company except in some matters not material to be mentioned here. Hamilton took charge of the outfit under this agreement and proceeded with the work. When he took charge, the bank advanced him some money. The Canadian Valley Construction Co. usually sent the vouchers for the money to be paid Hamilton to the bank. Hamilton would then sign the vouchers and the money would be sent to the bank. Occasionally the money was paid to Hamilton and he sent it to the bank. The correspondence between the bank and the Canadian Valley Construction Co. shows that the regular course of business was for the construction company to pay the bank and to depend on the bank to obtain Hamilton's signature to vouchers.

While Hamilton was in charge under the contract, he bought groceries and supplies for his men from the plaintiff grocery company and paid for part of them by check on the bank. He gave the company another check which the bank refused to pay. He then abandoned the trusteeship, and the grocery company brought this suit. The evidence shows that the bank never collected enough to reimburse it for the amounts advanced under the trusteeship. Hamilton never received anything for his services.

The evidence justifies the finding that Hamilton was acting for the bank. He represented the bank. The only reason why the bank did not itself take charge was because the president did not believe it had the right, to do so. The contract shows that it was made for the benefit of the bank to enable it to collect its debt, and Hamilton's possession was as much the possession of the bank as if it had sent out a constable to take charge under its mortgage. The contract Ryan had made with the construction company was to be carried out for the benefit of the bank. It was to be paid next after the expenses were paid.

The next proposition, and the one to which the principal part of the bank's brief is directed, is that the arrangement by which Hamilton continued the construction of bridges representing the bank could not impose a liability on the bank because the bank could not lawfully engage in business as a contractor, and, if it attempted to do so, its acts would be *ultra vires* and void. That it had no right to engage in the business of which constructing bridges was the main purpose and end must be conceded. It would be hard to find a business bearing less resemblance to banking than that of building bridges, and for that purpose employing men and teams, furnishing supplies, and attending to the numerous transactions arising out of such work.

The question in this case is whether, where for the purpose of collecting an indebtedness due it a bank has undertaken to perform the contract its debtor had made, it can repudiate a debt incurred while attempting to carry out the contract, where it has received the consideration for the debt.

The goods bought from the grocery company were used for the benefit of the bank in carrying out Ryan's contract to build the bridges. The bank received the entire proceeds of the contract. In other words, it received the proceeds of the groceries. Having received them, it should pay for them. It is immaterial whether the obligation to pay is placed upon the ground that the contract by the trustee or agent of the bank bound the bank, or the ground that the bank, having received the property of the grocery company, is bound to pay for it.

A great many of the state courts put the obligation to pay upon the ground that a bank has the right to use all lawful means to collect a debt, and that, where the object of engaging in a business which would otherwise be *ultra vires* is to collect a debt, a bank is bound by the contract thus entered into.

In the case of *Reynolds, Assignee, v. Simpson*, 74 Ga. 454, the facts were as follows: Harrison leased the Stonewall Iron Works and placed Bowie in charge as manager. Bowie drew drafts on the Vulcan Iron Works, which were discounted by the Bank of Rome. The Vulcan Iron Works failed, leaving the drafts unpaid. Harrison also failed and made an assignment. Bowie told

the president of the bank that, if he could work off the raw material on hand and sell it, the bank could be paid, but to do this he must have supplies. The president of the bank directed Simpson and Ledbetter to let Bowie have goods until he should instruct them otherwise, and told them the bank would pay them for whatever they sold to Bowie. The effort to realize on the debt did not prove profitable and, just as in the present case, did not pay the amount of the debt. In the course of the opinion the court said:

"Where a banking corporation acquires possession of property either by lien thereon or purchase of the same for the payment of the debt due to it, and expends money on it or furnishes supplies either for its profits or to carry on the business for which said property is employed, with the view of rendering it productive in order to satisfy the debt it holds against the former owner of the property, it is not chargeable with exceeding its corporate powers by engaging in a business beyond the scope and purpose of its creation. It is merely exercising a power which is common to all corporations. * * * Whether this banking corporation used this power of collecting its debts as a pretext for embarking in a business foreign to that for which it was created, which it was authorized to conduct, or whether it made a legitimate and proper use of it in furtherance of its legitimate business, was a question which was fairly submitted to the jury and upon which they have passed upon what appears to be sufficient evidence to uphold their finding."

In *Roebling Sons Co. v. First National Bank* (D. C.) 30 Fed. 744, the bank had loaned to Donaldson a sum of money to engage in the lumber business. He subsequently became embarrassed and the bank secured a deed of trust upon all of his property, which was foreclosed, and the bank purchased the property. It then proceeded by an agent to have the timber on the land cut and sold. The third paragraph of the syllabus is as follows:

"A national bank that has loaned money on timber land may, to protect itself and collect the debt, purchase the land at foreclosure sale and cut and sell the timber."

In *First National Bank v. Bannister,* 7 Kan. App. 787, 54 Pac. 20, the court said:

"Counsel for plaintiff in error argue that national banks are not authorized to buy and speculate in wheat. We answer that,

if necessary to seed a farm that they have been compelled to purchase under an execution in their favor, and in order to protect a claim owing to the bank, or in any event where the purchase is necessary to protect the bank's interest, it can purchase wheat."

See *Lowe v. Ring,* 106 Wis. 647, 82 N. W. 571; *McCraith v. National Mohawk Valley Bank,* 104 N. Y. 414, 10 N. E. 862.

In *German Nat. Bank v. Meadowcroft,* 4 Ill. App. 630, the bank took a certain grain warehouse in payment of a debt to it. When it took possession, there was wheat in the warehouse belonging to third parties. It was held that the bank, having come into possession of the grain in this manner, was responsible to the owners for the value of the grain when it failed to deliver it to them.

In case of *First National Bank of Charlotte v. National Exchange Bank of Baltimore,* 92 U. S. 122, 23 L. Ed. 679, after quoting the statute with reference to the powers of national banks, Chief Justice Waite said:

"Authority is thus given to transact such a banking business as is specified, and all incidental powers to carry it on are granted. These powers are such as are required to meet all the legitimate demands of the authorized business and to enable a bank to conduct its affairs, within the general scope of its charter, safely and prudently. This necessarily implies the right of a bank to incur liabilities in the regular course of its business as well as to become the creditor of others. Its own obligations must be met and debts due to it collected or secured. The power to adopt reasonable and appropriate measures for these purposes is an incident to the power to incur the liability or become the creditor."

This quotation is made for the reason that it is a clear statement of a principle upon which courts have proceeded. It is not intended to imply that that case goes as far as to what are reasonable and appropriate measures as some of the cases referred to. See *Bath Gas Light Co. v. Claffy,* 151 N. Y. 24, 45 N. E. 390, 36 L. R. A. 664; *Seymour v. Spring Forest Cem. Asso.,* 144 N. Y. 333, 39 N. E. 365, 26 L. R. A. 859; *Whitney Arms Co. v. Barlow,* 63 N. Y. 62, 20 Am. Rep. 504.

Another line of cases holds that such contracts are *ultra vires* and cannot be enforced, but that the corporation receiving the

property or money belonging to another, while engaged in an *ultra vires* employment or business, can be required to account to the rightful owner for the money or property so received. In the case of *Emigh v. Earling,* 134 Wis. 565, 115 N. W. 128, 27 L. R. A. (N. S.) 243, the Jenne Creamery Co. was engaged in the creamery business. The company had an arrangement with farmers to supply milk by which the creamery company was to take the milk, manufacture the butter, sell the same, and divide the proceeds, three and one-half cents to the creamery company for its services, and the balance of the sale price to the patrons. The creamery company was to deposit the money in the Berlin Bank, and at the end of the month to draw individual drafts to the several furnishers of milk for the amount to which they were found to be entitled upon computation of the amount of cream or butter supplied by each. D. J. and E. H. Jenne were heavily indebted and owed the bank of Berlin a considerable sum of money. All of the property of the creamery company and the Jennes individually was transferred to the cashier of the bank, one Brown, in trust, and to realize upon the same at his discretion, by sale or use, and apply the proceeds to the debts of D. J. and E. H. Jenne. The conveyance included the entire capital stock of the company, and Brown was authorized at his option either to close up the business or to continue its operation and form a new corporation. The conveyance required him, after all debts were paid, to turn the remainder of the property to the Jennes. Upon the transfer of the property, new officers of the corporation were elected consisting of the president and vice president of the bank, and Brown, the cashier, and the business of the creamery company was continued. Farmers continued to furnish milk, which was manufactured into butter, and the proceeds deposited in the bank in the name of the Jenne Creamery Co. The business was not profitable. After the business was continued some time, the bank was closed by the comptroller or treasurer and placed in the hands of a receiver. The people who supplied the milk had not been paid during the previous two months prior to the suspension of the bank. It was shown that drafts for the butter manufactured during these two months had

been received by the bank amounting to $2,520. It was held that the bank was liable for the money so received, and a trust was declared in favor of the farmers furnishing the milk for the amount of money due them; which was found to be in possession of the bank at the time it went into the hands of a receiver. In the course of the opinion the court said:

"The conclusions of the trial court are attempted to be averted by most vigorous contention that it is wholly beyond the power of a national bank to engage in creamery business, and much citation is made of federal authority to that effect. The exact limits of the power of a bank which, being a creditor, becomes possessed of property or property rights in various forms as security to do acts in management or improvement of such property or development of such rights in order to render them valuable to the end, in good faith, of thereby securing liquidation of the debts to it, is quite indefinite, and doubtless public policy requires that a bank, like an individual, should have broad powers of the exercise of discretion and judgment to the end that property or rights so held as security be rendered as valuable as possible so that it may not lose that which it ought to collect. *Security Nat. Bank v. St. Croix Power Co.,* 117 Wis. 211, 94 N. W. 74. But we need not try to resolve this somewhat uncertain and vexed question. No authority has been cited, and we think none can be, to deny the power of a banking corporation or any other corporation to disgorge property of another which it has got into its possession by any means whatever under a duty to disgorge. It may have had no legal power to take the steps by which the money of these plaintiffs' assignors came to its hands, but, having taken such steps and obtained their money, no such absurdity exists as a legal obstacle to its surrendering it. It would be a reproach to the law to hold any such doctrine of inequity. *Beloit v. Heineman,* 128 Wis. 398, 401, 107 N. W. 334."

This case was affirmed by the Supreme Court of the United States and is reported as *Rankin v. Emigh,* 218 U. S. 27, 30 Sup. Ct. 672, 54 L. Ed. 915. After quoting from the opinion of the Wisconsin Supreme Court, the court said:

"As we are bound by the findings of fact made below, and as the construction which the court gave to the contracts under which the milk was furnished is also binding, since such construction presents no question of a federal nature, it follows that all the contentions relied upon to procure a reversal of the judg-

ment must rest upon the assumption that, although the milk was received under contracts of bailment, and the proceeds arising were the property of the milk producers and were held by the bank for them, nevertheless the judgment was wrong because the bank, under the national banking laws, exceeded its powers when it virtually acquired the stock of the creamery and operated the same through its officers.   But when the contentions thus come to be considered in their ultimate aspect, their unsoundness is demonstrated by the decisions rendered at this term in *Citizens' Cent. Nat. Bank v. Appleton, Receiver of the Cooper Exchange Bank,* 216 U. S. 196, 30 Sup. Ct. 364 [54 L. Ed. 443].   We say this, even conceding, for the sake of the argument, the *ultra vires* nature of the transaction as contended for.   Although it would suffice to refer to that case as decisive here, in view of the importance of the subject, we briefly advert to the facts of the case to make apparent how absolutely conclusive the ruling there made is upon the contention here presented.   One Samuel owed to the Central National Bank $10,000.   Evidently the bank was not only unwilling to lend Samuel more money, but called upon him to pay off his existing indebtedness.   Under these circumstances, it was arranged that, if Samuel could borrow $12,000 from the Cooper Exchange Bank, and would use $10,000 of the amount to pay his debt to the Central National Bank, that bank would guarantee the repayment of the loan if made by the Cooper Exchange Bank, thus giving Samuel some further accommodation, and at the same time placing the Central National Bank in funds to the extent of its outstanding loan to Samuel.   The loan upon the guaranty was made.   Upon the bankruptcy of Samuel and the failure to pay the loan made by the Cooper Exchange Bank, the latter bank sued the Central National Bank to recover under the guaranty.   In the state courts, while ultimately the *ultra vires* nature of the guaranty was not denied, recovery was allowed to the extent of the $10,000, the amount actually received by the Central National Bank of the moneys of the Cooper Exchange Bank.   This court, without in any respect questioning that the state court was correct in holding that the contract of guaranty was *ultra vires* of the National Bank Act, nevertheless affirmed the judgment below.   Reviewing and commenting upon the rulings in *Logan County. Nat. Bank v. Townsend,* 139 U. S. 67, 11 Sup. Ct. 496, 35 L. Ed. 107, *Aldrich v. Chemical Nat. Bank,* 176 U. S. 618, 20 Sup. Ct. 498 [44 L. Ed. 611], *Central Transp. Co. v. Pullman's Palace Car Co.,* 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55, and *Pullman's Palace Car Co. v. Central Transp. Co.,* 171 U. S. 138, 18 Sup. Ct. 808, 43

L. Ed. 108, it was held, although restitution of property obtained under a contract which was illegal, because *ultra vires,* cannot be adjudged by force of the illegal contract, yet, as the obligation to do justice rests upon all persons, natural and artificial, if one obtains the money or property of others without authority, the law, independently of express contract, will compel restitution or compensation. That this ruling is here applicable is plainly manifested by the fact which we have previously pointed out that the relief afforded by the court below simply gave to the producers so much of their property as was actually in the hands of the receiver and awarded them a right to recover as general creditors of the bank to the extent only that their property had been received and appropriated by the bank."

In *Central Transp. Co. v. Pullman's Palace Car Co.,* 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55, Mr. Justice Gray said:

"A contract *ultra vires* being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between parties, so far as could be done consistently with adherence to law, by permitting property or money parted with on faith of the unlawful contract to be recovered back or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms, but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm but to disaffirm the unlawful contract."

It is believed the better ground upon which to place a recovery in cases such as the present is that the corporation, having received money or property by virtue of a contract not immoral or illegal of itself, is estopped to deny liability. In *Camden & Atlantic R. Co. v. Mays Landing R. Co.,* 48 N. J. Law, 530, 7 Atl. 523, the doctrine of *ultra vires* was involved. Mr. Justice Van Syckel said:

"The law does not imply a contract to pay the bondholders the money thus received. It is illogical to say that the law will imply a contract by the company which it has no power to make for itself. A contract cannot be implied where an express contract cannot be made. The law recognizes the obligation; it precludes or estops the attempt to evade it. Apply to it what

legal phrase you may, the underlying principle is that the corporation cannot set up its own infirmity when it is unconscionable to do so. The law forbids the defense on account of the flagrant injustice which would otherwise be done. The question of corporate powers is not entertained."

The judgment should be affirmed.

By the Court: It is so ordered.