## GILBERT v. CITIZENS' NAT. BANK OF CHICKASHA.

No. 5363—Opinion Filed Oct. 17, 1916.

(160 Pac. 635.)

1. **Evidence—Parol Evidence Affecting Writings—Ambiguity of Contract.**

Where the words employed to express a particular condition in a contract in writing are ambiguous and cannot be satisfactorily explained by reference to other portions thereof, it is not error to admit parol evidence to show the meaning intended by the parties as to the use of the words employed.

2. **Banks and Banking—National Banks—Powers and Liabilities.**

A plea of ultra vires is available to a national bank in a suit upon, or for the enforcement of, a contract beyond the powers of such bank, under the National Banking Act (Act Cong. June 3, 1864, c. 106, 13 Stat. 99), but if the bank has received the money or property of the plaintiff under an ultra vires contract, not malum in se and refuses to return the same, he may maintain an action for the recovery of so much of such money or property by which the bank has actually benefited, but in an action of tort, even though an ultra vires contract was an incident leading up to the tort, the plea of ultra vires is not available to such bank.

3. **Customs and Usages—Evidence—Admissibility Under Pleading.**

A local custom or usage applying to a special or particular class of business may not be proven to explain the ambiguous terms of

a contract, unless the existence of such custom or usage is pleaded.

### 4. Trial—Reception of Evidence — Sufficiency of Objection.

An objection to the introduction of such testimony that the same is "incompetent, irrelevant. and immaterial," is sufficient in the absence of an inquiry by court or counsel as to the specific grounds of the objection.

(Syllabus by Burford, C.)

Error from District Court, Grady County; Frank M. Bailey, Judge.

Action for conversion by N. T. Gilbert, as trustee, against the Citizens' National Bank of Chickasha. Judgment for defendant, and plaintiff brings error. Reversed.

Stevens & Myers and Burwell, Crockett & Johnson, for plaintiff in error.

R. D. Welborne, Stuart, Cruce & Cruce, and S. W. Hays, for defendant in error.

Opinion by BURFORD, C. It appears from the record in this case that during the cotton buying season of 1910-11, L. M. Potts, who resided at Chickasha, Okla., was engaged in the buying and selling of cotton upon a large scale, throughout the country tributary to Chickasha; that in order to finance his operations he made arrangements with various banks, among them the Lawton State Bank of Lawton, Okla. The effect of the arrangement with the Lawton bank was that Potts was to buy cotton at various inland towns surrounding Lawton, and that the purchasers of said cotton would ship the same to Potts. at Chickasha, Altus, and Hobart, but principally to Chickasha, for concentration, compression, and reshipment, there being cotton compresses located at the points named, but none at Lawton. Bills of lading for the cotton were attached to a draft drawn by the shipper against Potts and transmitted to the Lawton State Bank, and were there accepted by Potts or his agent, and paid by the Lawton bank, which bank then took the bills of lading, detached them from the paid drafts, and transmitted them to the Citizens' National Bank of Chickasha. It is agreed that the whole contract between the Lawton bank and the Chickasha bank was contained in the correspondence. After the first three letters transmitting the bills of lading, the form used by the Lawton bank was the same, except for the names and amounts therein contained, and was as follows:

"Citizens National Bank. Chickasha, Okla.

"Gentlemen: We beg to inclose you herein shipper's order bill of lading. No. D-9, covering twenty-five bales of cotton shipped from Snyder. Oklahoma, and signed by J. A.

Kreuger, as shipper, and consigned to the order of M. L. Potts, Chickasha, Oklahoma.

"Please hold same in trust for us, notifying Mr. Potts and receipting to us.

"Very truly yours,        Cashier."

The Chickasha bank acknowledged receipt of these bills of lading upon a form which stated:

"We hold in trust for your account with L. M. Potts, bills of lading or compress ticket for —— bales of cotton."

It was undisputed at the trial that the cotton bought by Potts at the various inland towns was of widely varying kinds and grades. and that in the cotton business when cotton was resold to Eastern buyers or to exporters, it was not only usual, but absolutely necessary, in order to make a sale, to reclassify the cotton, inasmuch as the purchasers would buy so many bales of cotton of approximately the same grade and class. In order that this might be done the Chickasha bank turned over to Potts the various bills of lading sent it by the Lawton bank. Potts paid the freight upon the bills of lading, had the cotton transferred to the compress, there compressed and reclassified, receiving from the compress company what were known as cotton tickets, one representing each bale of cotton sold and delivered, and identified by a number, and that after he had reclassified and sold the cotton he made up a new bill of lading which was attached to the draft against the purchaser for the amount of the cotton so sold, and that these drafts were regarded as cash. Necessarily in the prosecution of such a business the cotton paid for by the Lawton bank was not, and could not, be sold in lots which contained only cotton paid for by that bank, but the natural and necessary result of the business was that each draft upon the exporter was for cotton which was paid for not only by the Lawton bank, but by the Chickasha bank, which was. also advancing Potts' money, and by various other banks throughout Texas and Oklahoma. which banks were advancing him funds in the same manner as the Lawton bank.

Payments were made from time to time to the creditors of Potts by means of these different drafts, and at the close of the season there was unpaid to the Lawton bank the proceeds of 536 bales of cotton, and Potts was indebted to said bank in excess of $24,-000. It was agreed that the value of the 536 bales of cotton not accounted for was much in excess of the amount owed by Potts.

Under this state of affairs N. T. Gilbert, as trustee of the Lawton bank, which had meanwhile gone into voluntary liquidation in order to reorganize as a National Bank,

brought this action against the Chickasha bank, alleging the delivery of the bills of lading under the contract as aforesaid, and that the Chickasha bank had converted the proceeds of the 536 bales of cotton to its own account and had applied the proceeds of the same to the payment and discharge of the obligations of Potts to the Chickasha bank, with knowledge of the source from which the same was derived. The Chickasha bank alleged various defenses, of which the principal ones urged at the trial were that if its conduct in turning the bills of lading over to Potts were in violation of the contract, the Lawton bank knew of the way the drafts were being handled and had received the proceeds of drafts, which included the proceeds not only cotton paid for by it, but cotton paid for by the various other banks, and had thus acquiesced in the actions of the Chickasha bank; further, that the contract made with the Lawton bank was ultra vires and void, and also denying generally the allegations of the plaintiff's petition.

Upon the issues thus formed a trial was had to a jury who returned a verdict for the defendant. From the judgment on such verdict, a motion for new trial having been overruled, the plaintiff prosecutes error to this court.

The question to be first determined is whether or not the trial court erred in admitting testimony tending to explain the contract made between the two banks. After a careful examination of the whole record we are satisfied that in so doing the trial court did not commit any error. It is true, as contended by the plaintiff, that in some cases the words "hold in trust" might have a definite legal meaning, and that parol evidence to attempt to vary or explain such meaning would not be competent, but in construing any contract the necessary facts and surrounding circumstances which must have been and were known by the parties, must be taken into consideration. Here it must have been known to any man of ordinary business intelligence that the cotton represented by the bills of lading sent to the Chickasha bank was on the cars; that actual possession of it could not be obtained without the surrender of the bills of lading, which it is to be here noted were what is known as "shipper's order" bills of lading, and that the freight must be paid; that if these things were not done the cotton was subject to heavy demurrage charges, and ultimately, if not taken up, would be sold by the railroad company for the payment of its freight. It must have been known to the Chickasha bank that the Lawton bank had some special interest in these bills of lading, very probably as creditors of Potts. Under these circumstances, we think, it cannot be said that the Chickasha bank was bound to look only at the ordinary meaning of the words "hold in trust," and to simply take and keep the bills of lading until such time as the Lawton bank should demand their return. Especially is this true in view of the words contained in the letter, to the effect that the Chickasha bank was to notify Potts. If the Chickasha bank was simply to act as trustee for the Lawton bank, why notify Potts? In what way would he be concerned in such transactions? Clearly it was implied from the fact of the letters themselves that Potts had something to do with the transaction. Clearly from the nature of the business which must have been and was known to both banks, the interest of Potts in the bills of lading, which called for notification to him, must have something to do with his making or assisting in making some disposition of the cotton represented by the bills of lading. What was that interest of Potts? What was the duty of the Chickasha bank under such a letter? The letter itself does not state. It is admitted that these letters and the receipt above set out constitute the whole contract. Under such circumstances we have no hesitancy in saying that the contract was ambiguous upon its face, and if it was, it is apparent that between the parties parol evidence was competent, not to vary, but to explain, the contract and show what the meaning of such parties was when they entered into it. Janes v. Citizens' National Bank of North Enid, 9 Okla. 546, 60 Pac. 290; Cohee v. Turner et al., 37 Okla. 778, 132 Pac. 1082; First National Bank v. Womack, 56 Okla. 359, 156 Pac. 208; Barricklow et al. v. Boice et al., 50 Okla. 260, 150 Pac. 1094. As to this meaning there was wide variance between the plaintiff Gilbert, who was president of the Lawton bank, and the cashier of the Lawton bank, on the one hand, and the officers of the Chickasha bank, and the assistant cashier of the Lawton bank, who wrote the letters in question, on the other hand. Taking the testimony of the plaintiff in the case, the witness Gilbert, explaining the meaning of the contract, testified as follows:

"Q. Did you ever at any time give the Chickasha bank specific instructions and directions not to turn these bills of lading over to Mr. Potts until they got the cotton tickets? That they should not turn over these bills of lading to Potts until he surrendered the cotton tickets? A. I would say not, that no specific instructions were given to them. I would qualify it by saying that along with these bills of lading these letters were sent to them which have been introduced, asking that they be held in trust for us. Q. Did any of those letters state how

long the bills of lading should be held in trust? A. I think not. Q. Did you intend the Chickasha bank should hold the bills of lading for any specified time, and then send the bills of lading back to you? A. I would hardly say that it was the intention that the bills of lading should be sent back. Q. Did you intend that they should hold the bills of lading forever? A. No, sir. Q. You intended that those bills of lading should be turned over to Mr. Potts, A. No, sir. Q. Whom did you expect them to be delivered to? A. We expected them to be surrendered to the railroad company in return for compress tickets, covering the same cotton. Q. That is what you intended? A. Yes, sir. Q. Did you intend that this cotton should be reshipped from Chickasha? A. Yes, sir. Q. By whom? A. By Mr. Potts. * * * Q. How much were you paying the Chickasha bank for holding those bills of lading in trust? A. We did not pay them anything. Q. Did you agree to pay them anything? A. No, sir; we did not. Q. Did you expect to pay them anything? A. No, sir; we did not. * * * Q. Did he (meaning Potts) have a right to ship it? A. Certainly. * * * Q. You expected them (meaning the Chickasha bank) to go to the depot and surrender the bills of lading? A. Yes, sir. Q. And get the compress tickets? A. Let me testify and I will answer the questions. I don't want you to testify for me. Q. Go ahead. A. We expected the bank or the runner to go to the agent of the railroad company and exchange the bills of lading for compress tickets and hold the tickets until Mr. Potts was ready to ship the cotton out. Potts knows from his records just what particular bales of cotton are covered by these particular tickets. When he sells the cotton he can make out an invoice and sell a certain number of bales of cotton, weigh so much, and list them and fix up the bill of lading, and then attach to it the draft which he has drawn with a new bill of lading and have the bank make the transfer again, which would be an opposite transfer from the other one, exchanging the compress tickets for the new outgoing bill of lading. Q. What transfer would that be? A. He would have the bank transfer the compress tickets for the new bill of lading. Q. You expected the bank at Chickasha would first take the bills of lading to the railroad company and get the compress tickets? A. Yes, sir. Q. And Potts would make out an outgoing bill of lading? A. Yes, sir. Q. And Potts would bring that bill of lading signed by the bank and surrender for the tickets? A. I don't think Potts would get the bills of lading signed until the compress tickets were delivered. The bank would send their runner again to the agent, and the agent would sign the bill of lading and receive the compress tickets. * * * Q. Did you tell the bank that you would pay them for their runner to go make these exchanges? A. No, sir. Q. And you did not expect to pay them for it? A. No, sir. Q. If you had sent them (meaning the bank) a bill of lading with draft attached, or if you had sent the bills of lading and written them the amount of the draft, it would have notified them that he owed you on that cotton? A. Yes, sir. Q. And you did not do that in a single instance? A. No. sir."

It seems also from the record that some of the cotton was shipped to other points than Chickasha for concentration and compression.

Upon this testimony we are confronted with the contention on behalf of the defendant that any errors made in the trial court were immaterial for the reason that the contract of the Chickasha bank was ultra vires and void, and that therefore the plaintiff could not recover upon the undisputed evidence in the case, and that any error committed by the trial court was immaterial.

It is urged by counsel for defendant in error that in our decision of this question we ought to be governed by the decisions of the Supreme Court of the United States. We have no hesitancy in following this suggestion, not only by reason of the high learning and authority of that court, and that upon questions involving the power of national banks, our decisions may in certain cases be reviewable in that court, but also by reason of that decent comity between the courts of the states and those of the nation which the Supreme Court of the United States itself affords to decisions of the state courts upon questions of local law, and which in turn we should afford to that court upon questions peculiarly within its province. This we have consistently done, beginning with Johnston Fife Hat Co. v. National Bank of Guthrie, 4 Okla. 17, 44 Pac. 192, through Shawnee National Bank v. Purcell Wholesale Grocery Co., 34 Okla. 34, 124 Pac. 603, 41 L. R. A. (N. S.) 494, and Crowder State Bank v. Ætna Power Co., 41 Okla. 395, 138 Pac. 392, down to the recent case of First National Bank v. Womack, 56 Okla. 359, 156 Pac. 208. But upon principles announced in the decisions of the Supreme Court of the United States itself, it seems that we may concede, without deciding, that the contract in this case, as defined by the plaintiff, is beyond the scope of the powers conferred upon national banks, without the result contended for by defendant following such a concession. The Supreme Court of the United States, without deviating from the principle as stated in De La Vergne v. German Savings Inst., 175 U. S. 40, 20 Sup. Ct. 20, 44 L. Ed. 65, that where the suit is upon an executed contract the corporation may set up ultra vires to defeat a recovery, has still held, as stated in that case, that, if the action be upon a quantum meruit for the money or benefit actually

received by the bank, and the transaction was not malum in se, the action may be maintained and have followed the doctrine of De La Vergne v. German Savings Inst., supra, through many decisions, the most recent of which are Aldridge v. Chemical National Bank, 176 U. S. 618, 20 Sup. Ct. 498, 44 L. Ed. 611, Citizens' National Bank v. Appleton, 216 U. S. 196, 30 Sup. Ct. 364, 54 L. Ed. 443, and Rankin v. Emigh, 218 U. S. 27, 30 Sup. Ct. 672, 54 L. Ed. 915, where recoveries were had as for money had and received, the court saying, as in Central Trans. Co. v. Pullman Co., 139 U. S. 24-60, 11 Sup. Ct. 478, 488 (35 L. Ed. 55), that:

"To maintain such an action is not to affirm, but to disaffirm, the unlawful contract.'

These principles have had the concurrence of this court in Shawnee National Bank v. Grocery Co., Crowder Bank v. Æltna Power Co., and First National Bank v. Womack, supra. The Supreme Court of the United States has also held to the broad principle applicable to this case, that where the action is for a tort the defense of ultra vires does not apply. This doctrine was stated in Merchants' Bank v. State Bank, 10 Wall. 604, 645 (19 L. Ed. 1008), where the court said:

"Corporations are liable for every wrong of which they are guilty, and in such cases, the doctrine of ultra vires has no application."

The doctrine was applied to a case of conversion the same as the case at bar in National Bank v. Graham, 100 U. S. 699, 25 L. Ed. 750. There a bank as a gratuitous bailee had received certain bonds, the interest on which the officers would collect and place to the credit of the depositor. The bonds were entirely lost by gross negligence, no benefit accruing to the bank or any other person, except the thief who obtained them. There was no charge of collusion. The bank pleaded ultra vires. The court said:

"Conceding for the moment that the contract was illegal and void for the reason alleged in behalf of the bank, the consequence insisted upon would by no means follow. There was no moral turpitude on either side—certainly none on the part of the depositor. She was entitled at any time to reclaim the securities. The bank was bound in good faith and in law to return them, or to keep them, without gross negligence until they were called for. If, when applied for, they were refused, it cannot be doubted that they, or their value, according to the form of action adopted might have been recovered. White v. Franklin Bank, 22 Pick. (Mass.) 181. If the bank had destroyed them or had thrown them into the street, whereby they were lost to the plaintiff, the liability of the bank would have been the same. To have kept them with gross negligence, whereby the same consequence to the plaintiff was incurred, involv-

ed necessarily the same result to the depositary. The only way of escape from liability open to the latter would have been to return the property to the owner, or to get rid of its possession otherwise in some lawful way. Gross negligence on the part of the gratuitous bailee, though not a fraud, is in legal effect the same thing. Foster v. Essex Bank, 17 Mass. 479 (9 Am. Dec. 168). It is a tort, and an action on the case is the appropriate remedy for such a wrong. In many cases where there is a valid contract it may be regarded only as an inducement and as raising a duty, for the breach of which an action may be brought ex contractu or ex delicto, at the option of the injured party. 1 Chitt. Pl. 151. Corporations are liable for every wrong they commit, and in such cases the doctrine of ultra vires has no application."

It seems from these decisions that a clear distinction must be made according to the form of action brought by plaintiff, and that where the action is and can be maintained ex delicto, the question of a benefit received by the bank has nothing to do with the determination of the liability, nor is ultra vires a defense. As is said by Mr. Morse in his work on Banks and Banking, sec. 728:

"A distinction must be made at the outset between ultra vires transactions which constitute a tort and those involving matters of contract. No plea of ultra vires can ever avail to ward off liability for a tort. A tort is always ultra vires. It would be a lamentable state of law in which a court would allow a defendant to say, 'I exceeded my power, and as the law will not recognize any transaction which involves its own violation, you cannot recover.' The law will recognize its own violation to punish it and compel justice, and prevent a wrongdoer from taking advantage of his own wrong."

In First National Bank of Grand Forks v. Anderson, 172 U. S. 573, 19 Sup. Ct. 284, 43 L. Ed. 558, the Supreme Court of the United States again denied the right to plead ultra vires, as against an action for conversion. The second paragraph of the syllabus to that case reads:

"A national bank which, being authorized by the owner of notes in its possession to sell them to a third party, purchases them itself and converts them to its own use, is liable to their owner for their value, as for a conversion, even though it was not within its power to sell them as the owner's agent."

We do not understand that any of the more recent decisions of the Supreme Court of the United States in any way weaken the force of these decisions. In this jurisdiction the doctrine of National Bank v. Graham, supra, was followed by the Supreme Court of the territory in Johnston Fife Hat Co. v. Bank of Guthrie, 4 Okla. 17, 26, 35, 44 Pac.

192, 198. The conduct of the bank in that case, "amounted to a conversion," and after a lengthy review of the authorities it was held that the bank was liable, regardless of the plea of ultra vires.

Applying these principles to the case at bar, it seems that if the Chickasha bank, under the construction of the contract given it by the plaintiff, turned over the bills of lading to Potts, by gross or ordinary negligence depending upon whether or not it was a gratuitous bailee, and failed to either return them to the Lawton bank upon demand, or to account for their proceeds, it would be liable to the Lawton bank in an action for conversion, regardless of the receipt of any benefit by the Chickasha bank, since in an action of tort the limitation of recovery to the benefit received does not apply, and conversion lies as well where the wrongful act is for the benefit of a third party as where it is for the benefit of the tort-feasor. Addison on Torts, sec. 82; Cooley on Torts, 859-861; Street on Foundations of Legal Liability, vol. 1, p. 235 et seq., and cases cited.

It is to be noted that in this case there is involved the element of a positive act in delivering the bills to Potts, distinguishing it from those cases holding that conversion does not lie for a loss by a bailee through pure negligence, such as negligently allowing live stock to die, etc.

We are far from determining that plaintiff's construction of the contract was true, or that the Lawton bank did not acquiesce in the construction or the conduct in relation to the contract of the Chickasha bank, but we are of the opinion that the trial judge was correct in sending the case to the jury rather than in disposing of it upon the plea of ultra vires.

Passing to the assignments of error urged by the plaintiff, the most serious appears to be the admission over the objection and exception of the plaintiff of certain testimony tending to show a custom in and around Chickasha, existing between the banks and cotton buyers to allow the cotton buyer to take bills of lading, held as collateral security, for the purpose of enabling such buyer to reship and reclassify the cotton, have it compressed and transact the other business necessary to its sale. This custom was not pleaded by the defendant. His five defenses were: First, the general issue; second, the authority of the cashier; third, ultra vires; fourth, that Potts represented himself to be the agent of the Lawton bank to receive these bills of lading, and, believing him to be such, the Chickasha bank turned them over to him, and that the Lawton bank

knowingly accepted the proceeds of the acts of Potts, and thereby ratified his agency, and was estopped to deny it; and, fifth, that if there was any liability, that it did not exceed the amount owing by Potts to the Lawton bank. None of these defenses put the plaintiff upon notice that the defendant would attempt to explain the terms of the contract itself by testimony as to a local custom, applicable only to the cotton business.

In Smith v. Stewart, 29 Okla. 26, 118 Pac. 182, plaintiff alleged that he bought certain cotton of defendant, and that defendant guaranteed the weights at the compress. Upon the trial he attempted to prove not an express guaranty, but that there was a custom that the seller should guarantee the weight. The evidence in this regard was rejected by the trial court because not pleaded, and upon appeal this court said:

"There are probably several reasons why this evidence was not properly admissible under the state of the case at the time it was offered. A sufficient reason is that it is generally the rule that, before a local custom or usage applying to a special or particular class of business may be made the basis of recovery, it must be pleaded by the party relying on it. Harnett v. Holdrege, 5 Neb. [Unof.] 114, 97 N. W. 443; First Nat. Bank of Hastings v. Farmers' & Merchants' Bank, 56 Neb. 149, 76 N. W. 430; Mobile Fruit, etc., Co. v. Judy, 91 Ill. App. 82; Norwood v. Insurance Co., 13 Tex. Civ. App. 475, 35 S. W. 717; Oriental L. Co. v. Blades L. Co., 103 Va. 730, 50 S. E. 270; 22 Ency. of Plead. & Pr. p. 406. Some courts have recognized exceptions to the general rule, but it is not necessary to notice them here."

That case and the one at bar are very similar. This possible distinction may be noted that in Smith v. Stewart the evidence offered was for the purpose of establishing a term of the contract, whereas in the case at bar it is said that the evidence but tends to explain and make clear a term already a part of the agreement. It is important therefore to ascertain whether or not there are any exceptions to the rule stated in Smith v Stewart, within which the case at bar falls. As to the general doctrine there stated it might be as logically said that the rule is as applicable where the evidence is offered as the basis of a defense as of a recovery.

The possible exception to which reference in Smith v. Stewart, supra, is doubtless that suggested by the language of 22 Ency. of Pl. & Pr. 406-408, cited in the opinion. It is there said:

"It has been held in numerous cases that a general and well-established usage or custom, or one actually known to the parties to a contract, constitutes the common under-

standing of the parties, and should be resorted to as aiding in the interpretation of the contract in an action thereon, and that the evidence of such usage or custom, though local, may be admitted without being specially pleaded, at least where it does not contradict or vary the contract unreasonably and does not violate established law."

A number of cases are cited in support of this statement of the text. Considering them and others bearing upon the subject we find in Fish v. Crawford Mfg. Co., 120 Mich. 500, 79 N. W. 793, the question was whether the seller of lumber was liable for certain inspection charges upon an alleged implied contract to pay such charges. It was there held that evidence that a custom existed that the seller should pay such charges was admissible without being pleaded, since it was "only a matter of evidence, adduced for the purpose of showing what the implied contract between the defendant and plaintiff was."

In Breen v. Moran, 51 Minn. 525, 53 N. W. 755, evidence of a local custom as to how measurement of certain stone sold should be made by the "square yard" was admitted without being pleaded. There was a definite contract for the sale of the stone, payment to be made at so much per square yard, and the controversy was as to whether such measurement was to be made in the completed work for which the stone was sold, or by taking the aggregate measurement of the faces of the stone blocks. Here apparently the evidence was admitted to explain an ambiguity in the written contract, but the court does not put it upon any exception to the general rule, but says:

"We are of the opinion that a custom in its proper sense, even though local, need not ordinarily be pleaded."

The doctrine is squarely contrary to the decision of this court in Smith v. Stewart, supra, and to the great weight of authority.

Miller v. Insurance Co., 1 Abb. N. C. (N. Y.) 470, somewhat supports the rule suggested in 22 Ency. Pl. & Pr. supra. That case involved a suit for commissions. There was an agreement as to the amount, but not as to the time of payment. Evidence was admitted as to a custom covering the time when payment of such commission was due. The court held the evidence admissible under a general denial, saying:

"We think, also, that evidence of the custom was admissible under the general denial contained in the answer. When proved, it became one of the constituents of the contract, and the statement thereof in the complaint, therefore varied from the one actually made. The provision of the Code (section 149) which requires new matter to be specially pleaded applies only to matters of defense arising after the contract was made."

This case, however, gives the question here involved little consideration, and neither cites nor considers any of the authorities on the proposition. Lowe v. Lehman, 15 Ohio St. 179, involved a custom as to measuring brick. It was held the evidence as to custom might be admitted without being pleaded. The court there, without considering the general subject, simply holds the rule inapplicable in that case, saying:

"It would be impractical to apply the rule that special customs must be specially pleaded, to cases like the present. No authority for such application of the rule is shown by counsel. Pleadings would be almost endless, if parties were bound to set out in them all the shades and variations in the meaning of terms employed in contracts. The rule seems to be to require each party to come to the trial prepared to meet questions of that kind without special notice."

But the same court in Palmer v. Humiston, 87 Ohio St. 401, 101 N. E. 283, 45 L. R. A. (N. S.) 460, in a case involving a custom of physicians and surgeons, said:

"If he is relying upon a professional custom or usage obtaining among good surgeons at the time and in the place where the operation is performed, which would avoid the liability charged, he must specially plead that particular usage or custom."

In that case the surgeon had admitted a contract to perform an operation, and alleged that the use of certain sponges was necessary, but upon the trial sought to avoid liability for leaving one of the sponges in the patient's body by proving a custom to the effect that the nurse in attendance had charge of the sponges, and was responsible for their being properly accounted for, after the operation. This testimony would in effect explain and modify the terms of the contract, in the performance of which it was alleged the use of the sponges was necessary. But as above stated the Ohio court in the later decision holds that such a custom must be specially pleaded.

Hansbrough v. Neal, 94 Va. 722, 27 S. E. 593, considered a case where there was no contract between the parties, except what the law implied, and where the action was brought to recover what the services performed were reasonably worth. In such a case the court said:

"There does not seem to be any good reason why he should set up in his pleadings a local usage or custom by which the value of the services are fixed, since he is entitled to recover what is usual and customary for like services."

The decision can hardly be said to be an authority for the exception claimed, especially in view of Oriental L. Co. v. Blades L. Co., 103 Va. 730, 50 S. E. 270, where the court apparently limited the doctrine of the Hansbrough Case to the facts of that case, saying:

"There is some conflict among the authorities as to the necessity of pleading a custom or usage of trade. See 12 Cyc. 1097, and notes, 22 Am. & Eng. Encl. Pl. & Pr. 403, and cases cited. But whenever the question has been raised in this court, except in the case of Hansbrough v. Neal, 94 Va. 722 [27 S. E. 593], which was thought to be an exception to the general rule, it has been considered necessary for the party relying on such custom or usage to set it up in his pleadings. Jackson, Adm'r, v. Henderson, 3 Leigh [Va.] 196; Governor, etc., v. Withers, 5 Grat. [Va.] 24 [50 Am. Dec. 95.]"

Coyle v. Gozzler, 2 Cranch, C. C. 625, Fed. Cas. No. 3312, also cited is not available to us.

On the other hand, the adjudicated cases in great number supporting the doctrine of Smith v. Stewart, supra, hold that as a general rule proof of a local custom, or one applicable to a particular trade or business, must be pleaded in order to be proved. See as examples: First Nat. Bank v. Farmers' Bank, 56 Neb. 149, 76 N. W. 430; Norwood v. Alamo Ins. Co., 13 Tex. Civ. App. 475, 35 S. W. 717; Society, etc., Co. v. Haight, 1 N. J. Eq. 393; Templeman v. Biddle, 1 Har. (Del.) 522; Lindley v. Waterloo Bank, 76 Iowa, 629, 41 N. W. 381, 2 L. R. A. 709, 14 Am. St. Rep. 254; Turner v. Fish, 28 Miss. 306; Hayden v. Grillo, 42 Mo. App. 1; Dommerich v. Garfunkel, 32 Misc. Rep. 740, 65 N. Y. Supp. 564; Dutch Flat Water Co. v. Mooney, 12 Cal. 534.

Upon the particular branch of the case under consideration, Elmore, Quillian & Co. v. Parrish Bros., 170 Ala. 499-505, 54 South. 203, 204, is closely in point. There the parties had contracted for the sale of 500 bales of cotton at so much per pound. It was sought to introduce a usage to determine the weight of a bale of cotton. The court said:

"Nor do we know, in the absence of averment, how much cotton the parties intended when they used the word 'bales.' It may be that this was determined for the parties by a custom with reference to which they ought to be held to have contracted, or it may have been determined by a supplemental agreement defining the term, or by a course of dealing between the parties from which a definition by agreement was to be implied. In connection with the written contracts, it would be competent to prove any or all these things, in a case properly presented by the

pleading, without transcending the rule which denies the right to alter contracts in writing by parol evidence. Appellants cite cases which hold with respect to commercial contracts of a strictly mercantile character— that evidence of a usage of trade, which the parties knew, or may be reasonably presumed to have known, is admissible for the purpose of explaining the meaning of contracts; and they argue id certum est, etc. But the question here is a question of pleading, not of evidence. There is no averment of a usage or custom of the cotton trade by which a bale of cotton is taken to mean 500—as appellants suggested—or other number of pounds, and in respect to which the parties may be held to have contracted. Nor is there averment in those counts which undertake to set out the contracts according to their legal effect that they contracted for the sale of bales of cotton of any certain weight—an averment which might have been sustained by proof of a supplemental agreement, express or implied, or of a custom or usage fixing for the parties the weight of a bale."

The court reached the conclusion that:

"A custom or usage in the cotton business as to the weight of a bale of cotton must be pleaded in order to be relied on to show that a bale of cotton has a certain weight in such transaction."

In Mobile Fruit & Trading Co. v. Judy & Son, 91 Ill. App. 82-90, the plaintiff had sold some fruit to defendant. The fruit spoiled in transit. Testimony was admitted to establish a custom at the point of receipt to the effect that the loss should be borne by the shipper. The court said:

"The rule is well recognized that where a commercial contract is in any respect ambiguous and the necessities of the particular line of commerce render a particular custom or usage so indispensably necessary as to commend itself to enforce itself upon all those engaged in that line of commerce, there may be great propriety in allowing such custom or usage to be proved when it has become universal, well understood, and acquiesced in by all, in order to explain the intention of the parties upon the points as to which the contract itself is not explicit, although without such custom or usage, the law might give it a different construction. This is allowed upon the same principle which allows other extraneous facts to be proven, in view of which parties have entered into contract, and by the aid of which their intentions are ascertained, where otherwise they might be doubtful. Such custom or usage will not, however, be admitted to vary or control the express terms of a contract, but will be permitted to determine that which by the contract is left undetermined for the purpose of interpreting a contract when both parties thereto are supposed to have been acquainted with it, and to have contracted with reference to it. Dixon v. Dunham, 14 Ill. 324; Gilbert v. McGinnis et al., 114 Ill. 28 [28 N.

E. 382], and C., C. C. & St. L. R. Co. v. Jenkins, 174 Ill. 398 [51 N. E. 811, 62 L. R. A. 922, 66 Am. St. Rep. 296].

"But such a particular custom or usage in order to be invoked and proved by a party to such a contract must be specially pleaded, evidence thereof not being admissible under the general issue. Leggat et al. v. Sanders' Pl. & Ev. 884-886.

"And while we are of opinion that a custom or usage such as counsel for appellees attempted to show in this case, if one existed when the contract sued upon was made, could be shown, if properly pleaded, yet the general issue being the only plea that appellees interposed to the declaration, the court improperly admitted the testimony concerning such custom under the pleadings."

In view of these cases we think it can hardly be said that there is such weight of authority in the courts of the nation establishing an exception to the rule in Smith v. Stewart, supra, to the effect that evidence of a local custom, applicable to a particular business, may be introduced to explain a contract relating to such business, without first being pleaded, as to impel us to adopt such exception as to the law of this jurisdiction. Rather in view of the conflict in the cases, we feel free to determine the question of practice upon what we deem to be the underlying principles and to the end that ultimate justice not only in this, but in the cases to come, shall be accomplished. The primary object of pleading is to notify the adversary of that which he has to meet. Necessarily the evidence is ordinarily not a proper part of a pleading, but the allegation of a material fact is. Where a custom is general, long established, and well known, it is held that it need not be pleaded, since all are presumed to know of it. It is one of the common facts of life which enter into every case and which the parties are assumed to be ready to meet. But the same cannot be said of a special local custom applicable to a particular business. As to such a custom we think that the interests of general justice demand it should be properly pleaded and the opposing party notified of what he has to meet. Although we think this evidence admissible, if pleaded, to explain the contract under the authority of C., R. I. & P. R. Co. v. Dodson & Williams, 25 Okla. 822, 107 Pac. 921, its admission without being pleaded was prejudicial error. It tended to show what the contract was, and, taking it into consideration, the jury might well have said that the Chickasha bank had been guilty of no breach of the contract, whereas, without this testimony, the result might have been entirely different. Merely because the question of waiver was submitted to the jury we cannot say that the verdict was upon it alone, since

the court also submitted to the jury the question of what the contract was.

It is argued by defendant that no objection was properly made. The repeated objections were upon the ground that the evidence was "incompetent, irrelevant, and immaterial." After the close of the testimony plaintiff moved to strike out this testimony in relation to custom because not pleaded. This motion was overruled, and an exception saved. We think the question is properly before us for review. Rev. Laws 1910, sec. 5070, being the same as the law in force at the trial, provides:

"An oral examination is an examination in the presence of the jury or tribunal which is to decide the fact or act upon it, the testimony being heard by the jury or tribunal from the lips of the witness. Where any party desires to object to any question put to a witness, either before a court or tribunal or upon the taking of depositions upon notice, the ordinary objection of incompetence, irrelevancy or immateriality shall be deemed to cover all matters ordinarily embraced within such objections, and it shall not be necessary to specify further the grounds of such objections or to state the specific reasons whereby the question is so objectionable; but the court or opposing counsel may inquire of the objector wherein the question is so objectionable, and the objector shall thereupon state specifically his reasons or grounds for such objections."

The evidence as to the custom was irrelevant under the issues as formed,, and, in the absence of an inquiry by the court of counsel as to the specific grounds, the objection was sufficient. Certainly after the particular ground of objection was called to the court's attention by the motion to strike all the requirements of the statute were fulfilled.

The case of Enid & Anadarko R. Co. v. Wiley, 14 Okla. 310, 78 Pac. 96, and Sparks v. Territory, 16 Okla. 127, 83 Pac. 712, on appeal 146 Fed. 372, 76 C. C. A. 594, support the contention of defendant, but these cases were decided upon cases arising when the statute contained only the first sentence of the section above quoted. The succeeding part of the section was later added by the Legislature, perhaps because of the decision in Railway Co. v. Wiley, supra. These cases are clearly inapplicable to the present statute. Nor do we find anything in the later decisions of this court in conflict with the views herein expressed. In Continental Casualty Co. v. Wynne, 36 Okla. 325, 332, 129 Pac. 16, the objection held insufficient was merely "we object." In Diamond et al. v. Perry, 148 Pac. 89, though reference is made to Railway Co. v. Wiley, supra, the general objection was held insufficient because the evidence admit-

ted was competent, relevant, and material upon one issue in the case, though perhaps not as to all the issues.

In St. L. & S. F. R. Co. v. Murray, 50 Okla. 64, 150 Pac. 884, a motion to strike the "testimony of the witness along that line" was held insufficient to advise the court to what testimony reference was made. None of these cases decided the question before us now.

Upon the whole we are of the view that the testimony above referred to was improperly admitted under the state of the pleadings, and that the objections thereto were sufficient.

For the reasons given the cause should be reversed for further proceedings not inconsistent with this opinion.

By the Court: It is so ordered.