## CHICAGO, R. I. P. RY. CO. v. DODSON & WILLIAMS.

### No. 674.  Opinion Filed March 8, 1910.

#### (107 Pac. 921.)

1. **CARRIERS — Freight Charges — Cotton Shipments — Customs.** Where the terms "compressed cotton, any quantity," and "uncompressed cotton, any quantity," are used in a tariff sheet without further amplifying words, the contemporaneous, practical construction placed on said terms by the railroad company, through its agents in charge and the shippers, as to baled cotton delivered to the railroad company in an uncompressed state with the understanding that it was to be compressed, and then from the place of initial delivery transported to the place of original consignment, when there was no other promulgated tariff rate between the designated points concerning cotton shipments, is competent for consideration in determining the meaning of such terms.

2. **CUSTOMS AND USAGES—Explanation of Contract—Freight Charges—Cotton Shipments.** If there was a recognized custom or usage with reference to the payment by the railway company of the charges for compressing cotton, such charges being covered or included by the rate for transporting by the carrier of the compressed cotton, there being a question as to the particular meaning of the words "uncompressed cotton, any quantity," and "compressed cotton, any quantity," such custom is permissible to be proved as a matter of explanation of the meaning of such words as such in the tariff sheet.

(Syllabus by the Court.)

*Error from the United States Court for the Southern District of the Indian Territory; J. T. Dickerson, Judge.*

Action by Dodson & Williams, partners, against the Chicago, Rock Island & Pacific Ry. Co. Judgment for plaintiffs, and defendant brings error. Reversed and remanded for new trial.

On .the 5th day of March, 1904, Dodson & Williams commenced their action in the United States Court for the Southern District of the Indian Territory at Ryan, against the Chicago, Rock Island & Pacific Railway Company. Their complaint alleged that the plaintiffs were a partnership and that the defendant was a corporation, and that on the 8th day of February, 1903, plaintiffs delivered to the defendant as a common carrier, at the town of El Reno, in the territory of Oklahoma, 200 bales of cotton to be carried by the defendant to the city of Denver, which said cotton weighed in the aggregate 105,761 pounds, and that on the 23rd day of January, 1903, they delivered to the defendant 50 bales of cotton, weighing in the agregate 26,098 pounds at the city of El Reno; that on the 9th day of February, 1903, they delivered to the defendant 105,482 pounds at the city of Chickasha to be carried to Denver; that the cotton was sent shipper's order, with instructions to notify their representatives, the Overland Cotton Company, at Denver; that the defendant, through its agent, contracted with plaintiffs to carry the cotton from El Reno and Chickasha to Denver at the rate or 65 cents per hundred pounds, which plaintiffs allege was the regular tariff rate, and that the defendant after the cotton reached its destination unlawfully and wrongfully compelled the plaintiffs to pay 75 cents per hundred pounds, and that plaintiffs were compelled to pay an excess of $237.26 over the lawful rate; that defendant though often requested, had failed and refused, and still failed and refused, to pay the same. Plaintiffs ask judgment for $237.26.

Defendant answered, first, with a general denial, and second, admitting that it was a corporation and operated a railway between the points named by plaintiff in the Indian Territory and the city of Denver, and that at or about the time and places stated in the complaint it had received from plaintiffs for shipment to Denver certain uncompressed cotton. Defendant denied that it contracted with plaintiffs to carry the cotton, or any portion, from El Reno or Chickasha to Denver at the rate of 65 cents per hundred pounds; denied that 65 cents per hundred pounds was the tariff rate between El Reno and Chickasha, or either of said points

and Denver, and averred that 75 cents per hundred pounds was the tariff rate duly established and published by defendant for the carriage of uncompressed cotton or cotton compressed in transit by defendant from either El Reno or Chickasha to Denver, and that the defendant could not lawfully make an agreement to transport the cotton, or any portion thereof, at any other different rate than 75 cents per hundred pounds.

The cause came to trial on the 11th day of May, 1905; and a verdict was returned and judgment was rendered against the railroad company for $237.26 (22). A motion for a new trial, in accordance with the rules of the court, was duly filed, and on hearing was overruled, and the defendant, plaintiff in error here, by due proceedings secured the issuance and service of a writ of error and a citation.

Dodson & Williams, defendants in error, during the cotton season of 1902 applied to the local agent at Chickasha, Ind. T., R. Stevens, for a rate on cotton from Chickasha, Ind. T., and El Reno, Okla. T., to Denver, Colo. He, on behalf of railway, agreed to ship it for 65 cents per hundred pounds, unless it was to be shipped flat; that is, unless the shippers demanded that it should be shipped through without compressing, in which event the rate was 75 cents per hundred pounds. Acting on this rate they shipped about 1,700 or 1,800 bales, all of which was compressed by the railway company, and shipped as compressed cotton. All this cotton was shipped through on the 65-cent rate, except 450 bales, and on these the railway company compelled the agents of defendants in error, the Overland Cotton Mill, at Denver, Colo., to pay an additional 10 cents per hundred pounds before they would deliver the cotton.

The part of the printed tariff of plaintiff in error applicable to this transaction, and introduced in evidence, appears hereafter in the excerpt from testimony of R. Stevens. R. Stevens among other things testified as follows:

"Q. What position do you hold there? A. Local agent, Rock Island. Q. How long have you been agent for the Rock

Island there? A. Three years the 21st of this month, at Chickasha. Q. Mr. Stevens, are you acquainted with Mr. Williams here, a member of the firm of Dodson & Williams? A. Yes, sir. Q. Did he apply to you for a rate on cotton to Denver during the year 1902. A. Yes, sir. Q. Did you give him that rate? A. Of 65 cents? Q. Yes. A. Yes, sir; I did. Q. That was the rate of the railroad company? A. That was my construction of it. Q. Was that rate ever charged during the time that this cotton was shipped? A. Not to my knowledge; no sir. Q. Do you know, Mr. Stevens, how much of this cotton was shipped there on that rate? A. I do not; I find in looking over our records that we have no correction of any of the cotton that went to Denver. It all went through on the 65-cent rate. Q. Under that 65-cent rate who paid for the compressing? A. The railroad company paid it out of the earnings."

Cross-examination:

"Q. Mr. Stevens, what tariff was in effect in November and December, 1902, and January and February, 1903? A. 1818 E. I believe was the tariff. Q. Did you show the printed tariff to Mr. Williams in 1902? A. I showed this tariff to him. Q. Is that what you showed him? A. A copy of this. Q. Did you show him the printed matter on the thirteenth page, marked items 5 and 6? A. I did, and thoroughly discussed it, the clerks in my office and Mr. Williams and myself."

Said items are in words and figures as follows:

## SPECIAL COMMODITY RATES.

| Item No. | FROM | TO | CARLOADS | Rates in Cents per 100 Lbs. |
|---|---|---|---|---|
| 5 | C. R. I. & P. Ry., here in the Indian and Okla. territories. | Denver, Colo. Pueblo, Colo. Colorado Springs, Colo. | Cotton Uncompressed any quantity | .75 |
| 6 | Do. | Do. | Cotton Compressed any quantity | .65 |

"Q. The expression 'flat shipments,' as used here a little bit ago, explain what it means? A. Flat shipments? Q. Yes. A. Cotton that is uncompressed moves flat as it comes from the gin. I suppose there is a few of them that don't know what it is. Q. Do you a call it a flat shipment where it is shipped either compressed

or uncompressed at carrier's option? A. No; not unless the shipper specifies he wants it moved flat. Q. Where the shipper specifies he wants it moved without compressing? A. Yes, sir. Q. That is what you mean? A. Yes, sir; where the shipper specifies he wants it moved without going through the compress. Q. Did you ever handle any that way? A. Yes, sir. Q. Did you handle any to Denver? A. Yes sir. Q. At what rate did you put it through? A. Seventy-five cents. Q. It went through without compressing? A. Yes."

Redirect examination:

"Q. Mr. Stevens, this cotton shipped by Dodson & Williams, was that compressed? A. It was. Q. If the rate is given in the tariff as 65 cents for compressed cotton, what does that mean? What does that include? A. Well, I take it that it means the cotton that is to be compressed in transit. Q. What I want is the regulations and custom; who pays the compressing charges? A. It is customary for the company to pay for the compressing. Q. I believe you said, in answer to Mr. Blake's question, you stated where the rate was 75 cents for uncompressed cotton, that was where the shipper demanded that the cotton be shipped through flat, without being compressed? A. Yes, sir."

The following are the specifications of error:

First. That the trial court erred in overruling the motion of the plaintiff in error for a new trial.

Second. That the trial court erred in overruling the objection of counsel for plaintiff in error to the following question asked the witness R. J. Williams: "Was that the rate it gave?" meaning the rate given by the printed tariff.

Third. That the court erred in overruling the objection of counsel for plaintiff in error to the following question asked of the witness R. Stevens: "Was the rate ever changed during the time that this cotton was shipped?"

Fifth. That the court erred in overruling the objection of plaintiff in error to the following question asked the witness R. Stevens: "I will ask you when a rate is made by a railroad on compressed cotton, what does that mean?"

Sixth. The court erred in overruling the objection of the

plaintiff in error to the following question propounded to the witness R. Stevens: "If the rate is given in the tariff at 65 cents for compressed cotton, what does that mean, what does that include?"

Seventh. The court erred in overruling the objection of the plaintiff in error to the following question asked the witness R. Stevens, to wit: "When a rate of that kind is made by the ordinary rule of the railroad company, who pays the compressing?"

Eighth. That the court erred in overruling and denying the motion made by counsel for plaintiff in error, before the argument and before the charge to the jury, to find a verdict for the defendant on the following grounds: (1) That the evidence entirely failed to show that the plaintiffs had paid any sum in excess of the rate provided by the defendant's printed tariff; (2) that the evidence entirely failed to show that the plaintiffs had paid any sum of money under protest; (3) that the evidence entirely failed to show that any contract covering the rate of shipment involved in the action had been made between the plaintiffs and defendant.

Ninth. That the said court erred in refusing to give to the jury the following instruction, requested by the plaintiff in error:

"You are instructed that the law requires that any rule or regulation which would in any way change, affect, or determine any part of the aggregate of rate and charges shall be stated in the printed tariff, and make it lawful."

Tenth. That the said court erred in refusing to give to the jury the following instruction, requested by the plaintiff in error:

"You are instructed that the language used in the printed tariff shown to have been in force at the time is plain and unambiguous, and there is no allegation in the pleadings that the words used have a technical or unusual meaning, and under which an issue of ambiguity can be tried, and you must disregard all testimony introduced to or tending to show a construction placed on the language of the tariff other than or different from the plain import of the words used."

Eleventh. That the said court erred in giving the following instruction during the course of the charge to the jury:

"Therefore, if you should find in this case that the rate of 65 cents per hundred was the regular tariff rate for compressed cotton, and you should find that the railway company entered into an agreement to deliver this cotton at its destination at a less rate than the regular schedule rate given to the public for like cotton shipments between the same points, then I instruct you that the said rates would be unlawful, and the plaintiff could not recover."

Twelfth.    That the said court erred in giving the following instruction during the course of the charge to the jury:

"If you should find that the regular tariff rate was 65 cents per hundred for compressed cotton, and that the cotton in question was delivered to defendant by the plaintiff uncompressed, and that the defendant, upon its own motion, and for its own benefit, compressed said cotton, and such had been its custom with the public and with the plaintiff, if you should find further that in this particular cotton in question they charged the sum of 75 cents per hundred, then I instruct you that your verdict should be for the plaintiff for the amount proven to have been paid in excess of 65 cents per hundred."

*M. A. Low, Blake, Blake & Low* and *Gilbert & Bond,* for plaintiff in error.

*Potter, Bowman & Potter,* for defendants in error.

No copies of briefs reached the reporter.

WILLIAMS, J.    (after stating the facts as above).    The question involved here is the construction of the tariff sheet rate of the defendant as to the rates for "cotton uncompressed, any quantity," and "cotton compressed, any quantity"; the former being 75 cents and the latter 65 cents per hundred pounds between the points named.    The cotton having been delivered by the shipper to the carrier in an "uncompressed" state, with the understanding that it would be compressed and transported by the carrier in a "compressed" condition to its ultimate place of consignment, and the tariff sheet not covering such a specific consignment, the question arises as to whether or not this shipment was properly chargeable at the rate for "uncompressed" cotton or "compressed" cotton.    See *In re Alleged Unlawful Rates and Practices in the*

*Transportation of Cotton by the K. C., M. & B. R. Co. et al,* 8 Interst. Com. R. 121.

It does not seem very material whether we view this tariff rate as a legislative act or merely a contract, as the rule of construction, with a few exceptions, seems to be the same in each case. The agent of the carrier testified as follows:

"Q. If the rate is given in the tariff as 65 cents for compressed cotton, what does that mean? What does that include? A. Well, I take it that it means the cotton that is to be compressed in transit. Q. What I want is the regulation and custom, who pays the compressing charges? A. It is customary for the company to pay for the compressing. Q. I believe you said, in answer to Mr. Blake's question, you stated where the rate was 75 cents for uncompressed cotton, that that was where the shipper demanded that the cotton be shipped through flat, without being compressed? A. Yes, sir."

Mr. Lawson in his work on Usages and Customs (1887) p. 463, § 223, lays down the rule that:

"Where a statute is expressive as to some points and silent as to others, usage may well supply the defects, if not inconsistent with the express directions of the statute."

And, further, that:

"In a general statute doubtful words may be explained by reference to general usage."

And, that:

"In a statute applicable to a particular place only, ambiguous words may be construed by the usage at that place."

In the explanation of doubtful language in a legislative act contemporaneous and continuing usage has always been much relied on. Lawson on Usages and Customs (1887) § 223, p. 462, and authorities cited in footnote 4.

In the case of *McKeen v. DeLancy's Lessee,* 5 Cranch, 22, 3 L. Ed. 25, it was held:

"Under the act of Pennsylvania of 1715, which requires a deed to be acknowledged before a justice of the peace of the county where the lands lie, it had been the long-established practice

before the year 1775 to acknowledge deeds before a justice of the Supreme Court of the province of Pennsylvania. And although the act of 1715 does not authorize such a practice, yet as it has prevailed, it is to be considered as a correct exposition of the statute."

In the same case the rule was laid down that courts did not take judicial knowledge of a custom.

See, also, *Jackson v. Gumaer,* 2 Cow. (N. Y.) 567; *McFerran et al. v. Powers et al.,* 1 Serg. & R. (Pa.) 102.

In the case of *Detroit & Milwaukee R. Co. v. Van Steinburg,* 17 Mich. 99, the late Chief Justice Cooley, in delivering the opinion of the court, said:

"It was also suggested that the evidence would have had some tendency to establish a general practice among railroad companies, which must be presumed to have been established, because necessary to prevent similar accidents, but no further attempt was made to prove any such general practice; and, as the custom of only one company could have no tendency to establish it, I think the judge erred in admitting the evidence, especially as there is no claim that it was offered for any such purpose."

In the case of *Bancroft v. Peters,* 4 Mich. 619, the court said:

"But how does the plaintiff stand in this respect? He represents the New York & Erie Railroad Company; they received and shipped the property as 'unwrought marble.' In the absence of any testimony and unexplained, that must be presumed to have been the agreement between the parties, that is, it must be presumed that both parties understood that it was to be shipped as 'unwrought marble.' The plaintiff, then, had to rebut that presumption by proof. The agent of the company was sworn in the case, and testified that it was so designated by mistake; that he, the witness, and other officers of the company had always regarded this species of property as properly designated by the term 'wrought.' This opened the case for further evidence, and it became a question of fact to know in what sense these terms were used by manufacturers, dealers, and carriers when applied to marble, and upon this point there was considerable evidence, and the court could not have done less than to submit it to the jury, and it was so submitted, and the jury found against the plaintiff, and we cannot say that the verdict was wrong, nor can we say that any improper evidence was submitted to them."

In the case of *Greason v. St. Louis, I. M. & S. R. Co.*, 112 Mo. App. 116, 86 S. W. 722, which was an action to recover for an overcharge on freight, it is said:

"No decision has been cited that 'lumber' means hewn ties. If the word 'lumber' has any peculiar meaning among dealers in it or in transportation circles, which would embrace or exclude hewn ties, no evidence of the fact was offered. The meaning to be applied to the word in the letter in question is its ordinary meaning in vernacular speech, unless the previous dealings between the plaintiffs and the defendant, or the circumstances under which the letter was written, or the light thrown on the intention of the letter by the other facts in evidence, the tariff sheet, and the testimony of the freight agent compel a different significance."

See, also, *Martin et al. v. Marshall et al.*, 7 Manning & Granger (49 Eng. Con. Law) 729; *Wayne v. Steamboat General Pike*, 16 Ohio, 423; *Andrews, Use, etc., v. Roach & Coffey*, 3 Ala. 590, 37 Am. Dec. 718; *Cooper et al. v. Berry et al.*, 21 Ga. 526, 68 Am. Dec. 468; *Berry et al. v. Cooper & Boykin, Ex'rs*, 28 Ga. 543.

In the case of *Higgins v. Brown, Judge et al.*, 20 Okla. 355, 94 Pac. 703, this court said:

"Indeed, where a particular construction has been generally accepted as correct, and especially where this has occurred contemporaneously with the adoption of the Constitution or statute, and by those who had opportunity to understand the intention of the instrument, it is not to be denied that the presumption exists that the construction rightly interprets the intention. And when this has been given by officers in the discharge of their official duty, and rights have accrued in reliance upon it, which would be divested by the decision that the construction was erroneous, the argument *ab inconvenienti* is sometimes allowed to have very great weight."

The words and phrases employed in a tariff approved by the Interstate Commerce Commission seem to be subject to the same rules of construction as when used in legislative acts. The intention or understanding of the parties as to the meaning of the words employed in the tariff at the time the shipping contract was entered into would neither control nor be binding so as to constitute a valid contract if in conflict with such

tariff rate, for all shipping contracts made in violation of tariff rates approved by the Interstate Commerce Commission are absolutely void. If we were permitted to look to the intention of the parties and what they meant, for the purposes of construing or interpreting the tariff rate, we might permit a contract to be made that was in conflict, and not in accord, with the tariff provision, which would not be permissible. If a custom or usage is approved, and the tariff provision is so uncertain, doubtful, ambiguous, or indefinite as to call for construction and interpretation, the same shall be made in the light of such custom or usage and the contemporaneous interpretation placed thereon by the officers under the limitations and conditions as hereinbefore set out.

It appears that the baled cotton delivered by the plaintiffs to the defendant was by or for said railway company compressed and thereafter shipped by it to its place of consignment; there being no other tariff rate than that heretofore referred to applicable to such shipment. The regulation by law of the charges by a public carrier is to the end that the public may not only have proper service for a reasonable charge, but that there may be no discrimination as against shippers. There is no appearance in this transaction of any device to evade any regulation.

The question arises further as to whether the usage or custom was sufficiently proved. We think not. Only the custom of the plaintiff in error railway company was proved. It was necessary to go further and show the custom or usage of the railway companies in the cotton growing states, at least in the southwest, relative to the paying of the compressage as a part of the freight charge. This was not done, and for that reason the judgment is reversed and remanded, with instructions to grant a new trial.

Dunn, C. J., and Turner, J., concur; Kane and Hayes, JJ., concur in the conclusion.