**CLEVELAND et al. v. MASCHO et al.**

No. 8796—Opinion Filed July 30, 1918.

Rehearing Denied Nov. 19, 1918.

(175 Pac. 927.)

1. **Customs and Usages—Evidence—Admissibility.**

Where there is ambiguity or uncertainty as to the meaning of the terms used in the written agreement between the parties, usages and customs may be resorted to for the purpose of interpreting them, and to fix and explain the meaning of the expressions and words of doubtful and various meaning.

2. **Same.**

Words technical or ambiguous on their face, or foreign or peculiar to the sciences or arts, or to particular trades, professions, occupations, or localities, are explainable where they are employed in written instruments by parol evidence of usage.

3. **Same—"Overdrafts"—Meaning of Word —Evidence.**

The petition in this case examined, and it is held that, under the allegations thereof, it was error to sustain an objection on the part of the bank to the introduction of evidence.

(Syllabus by Hooker, C.)

Error from District Court, Lincoln County; Chas. B. Wilson, Jr., Judge.

Action by A. S. Cleveland and another, surviving partners of the firm of Wm. D. Cleveland & Son, against A. E. Mascho and another. Judgment for defendants, and plaintiffs bring error. Reversed and remanded.

Fulton, Shirk & Danner, for plaintiffs in error.

Ames, Chambers, Lowe & Richardson, for defendant in error First Nat. Bank of Chandler.

Opinion by HOOKER, C. On the 24th day of March, 1914, one Mascho informed the plaintiffs in error by mail that he had to sell or ship 132 bales of good cotton, mostly white, in strictly M. M. M., and inquiring of it if it could sell it and the charges and differences in grades; to which on the 27th day of March, 1914, the plaintiffs in error replied, in substance, as follows:

"We have your postal of recent date to hand and thank you for it. * * * There is a good demand in this market for the better grades and a fair demand for all grades. * * * Our commission charge is $1 per bale and this charge covers all expenses for the first thirty days after the cotton arrives save the freight from your shipping point to Houston. After thirty days there is a charge of 10c per bale per month for storage, and the actual insurance which runs about 20c per bale per month. * * * The enclosed letter explains our rates and conditions of advances. We have had no opportunity to become acquainted with you heretofore and therefore have no credit basis for our transactions. In the event you ship us and draw against the shipment please have your bank guarantee the conformity of your draft and shipment with the terms of our letter and against overdraft; otherwise please give us information of your business, the names of your references, etc., that we may establish a basis for credit independent of the aid of others."

Together with this letter there was a communication which contained the following advice:

"Subject to change without notice, to meet changing markets and conditions, we offer the following advances:

"For straight white cotton, Middling and better, average 500 pounds, we will advance $40 per bale if shipped to be sold on arrival; or $35 if to be held.

"For grades running from Strict Good Ordinary to Strict Low Middling inclusive, average 500 pounds in weight, we will advance $30 per bale if shipped to be sold on arrival.

"For grades below Strict Good Ordinary and for bollies pulled, perished or other irregular cottons we will make no advances, but we solicit consignments to be sold on arrival."

Thereafter, on April 16, 1914, Mascho wrote the plaintiffs in error as follows:

"I shipped you 132 bales Good Cotton except 6 bales. Not so good. * * * I have drawn on you for $40 and expect to sell within 30 days would like for you to try and sell it Hog. Get the best and wire us and if we sell it will wire you back."

And on April 15, 1914, the First National Bank of Chandler, by E. C. Love, Cashier, wrote plaintiffs in error as follows:

"Mr. A. E. Mascho of this place is to-day drawing through this bank for $5,280. Attached to the draft is a bill of lading covering 132 bales of cotton. When the draft is presented we hope you will take care of same and upon arrival of the cotton, if you find any of it that is not as represented we would be glad to have you draw on us for the amount with a statement attached. According to Mr. Mascho's statement with the exception of one or two bales he is sure of your finding the list perfectly satisfactory."

And on the 17th day of April, 1914, the plaintiffs in error wired the First Nati al Bank at Chandler, Okla., as follows:

"Your letter received. Cannot pay Mascho

draft unless your bank guarantees against overdraft. Please wire quickly before draft reaches us. Writing."

And on the same date plaintiffs in error communicated with said bank by letter as follows:

"We thank you cordially for your letter of the 15th inst., giving us notice of shipment of 132 bales of cotton by Mr. A. E. Mascho and draft for $5,280. We wired you night letter as follows and beg to confirm:

"Letter received. Cannot pay Mascho draft unless your bank guarantees against overdraft. Please wire quickly before draft reaches us. Writing.'

"The inclosed letter explains our rates and conditions of advances. We hope you will entrust the shipment to us when we shall exert ourselves to the utmost to please you and your customer. We wired your bank for a guarantee because your letter did not explicitly state a willingness to guarantee against overdrafts but may have been intended for that purpose. With cordial regards, we remain,

"Very truly yours,
"Wm. D. Cleveland & Sons.

"P. S. You failed to tell us in your letter whether you want the cotton held or sold upon arrival. Unless we hear from you to the contrary we shall presume you want the shipment sold and shall follow that course."

And on the 18th day of April the First National Bank wired plaintiffs in error as follows:

"If Mascho overdrafts we will pay draft for the amount."

And on the 25th day of April, 1914, Mascho National Bank wrote plaintiff as follows:

"Your letter of 17 inst., in regard to disposing of the 132 bales of cotton shipped you by A. E. Mascho of this place received. We are advised by Mr. Mascho that he wrote you several days ago about this. You no doubt have received his instructions by this time. In reply to your telegram of the 17 we wired you to draw on us for the amount of the overdraft if there be any and we now wish to confirm the same."

And on the 25th day of April 1914, Mascho wrote plaintiff in error as follows:

"Received your card. In reply will say do not sell cotton until you hear from us; want to hold for about 30 days, except you have sold the very bad bales. Suppose it is better to get rid of the tough ones but I did not tell you to sell only to submit an estimate of its worth."

The plaintiffs in error instituted this suit in the lower court against Mascho and the bank to recover from Mascho as principal, and from the bank as guarantor, a balance for the advances made on this shipment of cotton.

In the petition filed in this action it is alleged that plaintiffs are cotton factors at Houston, Tex., and that on March 24, 1914, Mascho wrote to it that he had 132 bales of cotton which he desired to sell, and asked the plaintiffs if they could handle the same, and if they could to send rates and grades and differences; and thereupon the plaintiffs in error replied by communication as stated above. And on the 15th day of April, 1914, Mascho accepted the proposal of the plaintiffs, and on said day shipped to them 132 bales of cotton, and at the same time drew a draft on them for $5,280 through the First National Bank of Chandler, Okla. The correspondence, as detailed above, is all the correspondence which passed between the parties out of which this transaction arose. It is contended by the plaintiffs in error that, inasmuch as the letter of the bank to Mascho was not satisfactory, they wired the bank and received this communication from it which guaranteed the plaintiffs in error against any overdraft on said bank made by Mascho. It is further alleged in the petition that, at the time of said draft and guaranty, Mascho was indebted to the bank in the sum of $7,000, and that the amount of said draft thus paid by the plaintiffs in error to Mascho was received by the bank and credited upon Mascho's indebtedness to it. It is further alleged that at the time said guaranty was given, and for a long period of time prior thereto, a guaranty against overdrafts and a promise to pay overdrafts had a certain well-defined and well-understood meaning among cotton factors and cotton shippers and banks, and meant that in case cotton shipped to a factor for sale is drawn against, and when sold should not bring enough to pay all charges and advances, the person making such guaranty, or promising to pay such overdraft, should pay the difference; and that the plaintiffs, relying on said guaranty thus made to it by the bank, paid said draft and the other charges incident to the handling of said cotton, and that when the same was sold there was a deficiency of $1,674.10, to recover which this action is instituted.

Upon the trial of this cause in the lower court an objection to the introduction of any evidence against the bank was sustained, for the reason that the petition did not state facts sufficient to constitute a cause of action against it.

It is not contended here that the act of the bank in making this guaranty was ultra

vires; hence that question may be dismissed from our consideration.

It may be safely said that the only issue in this case is the meaning and effect to be given to the word "overdraft" as applied to the facts in this case. The plaintiffs in error contend that this correspondence constitutes a contract which is susceptible of but one interpretation, and that is that the bank bound itself to make good any shortage that might exist between the amount advanced by the plaintiffs in error to the defendant Mascho and the net amount received by the plaintiffs in error from the sale of the cotton. While the bank contends that the extent of its guaranty was merely that the cotton, on its arrival at Houston, should prove to be as represented, and inasmuch as the plaintiffs in error did not bring this suit upon any theory that the cotton was not as represented, that no cause of action was stated.

It appears from the examination of the record that in the first letter written by the bank to the plaintiffs in error the bank said:

"If you find any of it not as represented we would be glad to have you draw back on us for the amount with the statement attached."

Thereupon the plaintiffs in error immediately wired the bank, in substance, that they would not pay the Mascho draft unless there was a guaranty against overdrafts, and advising it that, if the bank and Mascho expected the draft to be paid, a guaranty against overdrafts would have to be given; and thereupon the bank wired, "If Mascho overdraft we will pay draft for amount."

The bank contends that by the meaning of the word "overdraft," as used by it, that it merely intended to guarantee the conformity of cotton with the representations of Mascho, and be responsible to the plaintiffs in error for any sum that it might advance in excess of the amount it agreed to advance; and it urges that the plaintiffs in error were willing to make advances upon shipments of cotton dependent upon the condition of the market at the time of the shipment, and that the bank was willing to guarantee the cotton shipped was in accordance with the representations of Mascho, and that he had shipped the number of bales shown by the draft, and it was willing, and still is willing, to make good any difference that existed between the amount plaintiffs in error agreed to advance and the draft drawn upon it. It is further urged by the bank that the limitation of the amount for advancement per bale is in itself a sufficient refutation of the contention now made by the plaintiffs in error, inasmuch as the correspondence shows that the plaintiffs in error were willing to advance only so much per bale if to be sold within a limited time and a less amount if to be sold at a longer time; and it is further urged that the correspondence indicates conclusively that the guaranty was a present one—that is, for a present default, if any—and not a continuing guaranty.

We have carefully considered this record, and in our minds there are plausible reasons supporting the theories of either party to this action.

However, in the petition in this action it is alleged—

"that at the time of the correspondence which passed between these parties a guaranty against overdraft or a promise to pay overdraft had, and for a long time prior thereto had, a certain well-defined and well-understood meaning among cotton factors, cotton shippers, and banks, and meant that in case cotton shipped to a factor for sale is drawn against, and when sold should not bring enough to pay the charges and advances, that the person or persons making the guaranty or promising to pay the overdraft should pay the differences; and that said draft * * * was on the 18th day of April, 1914, in ordinary course of business, presented to the plaintiffs in error for payment, and the plaintiffs, relying on said guaranty and promise of the bank to pay any overdraft, paid the same in full."

This court in the case of Jones v. Cochran, 33 Okla. 431, 126 Pac. 716, said:

"The circumstances under which usages or customs may be resorted to for the purpose of interpreting a contract are well settled. Such extrinsic aid cannot be resorted to when the contract is susceptible of a reasonable construction on its face. Mr. Green leaf upon this question, says:

" 'Their true nature is to interpret the otherwise indeterminate intentions of the parties, and to ascertain the nature of their contracts arising, not from express stipulation, but from mere implications and presumptions, and acts of doubtful and equivocal character, and to fix and explain the meaning of the words and expressions of doubtful and various senses. * * *'

'The same author again says:

" 'But, though usage may be admissible to explain what is doubtful, it is not admissible to contradict what is plain.'

"The same doctrine is expressed in Oelricks v. Ford, 23 How. 49, 16 L. Ed. 534, in the following language:

"As a general rule, there must be ambiguity or uncertainty upon the face of the written instrument arising out of the terms

used by the parties in order to justify the extraneous evidence, and, when admissible, it must be limited in its effect to clearing up the obscurity. It is not admissible to add or ingraft upon the contract new stipulations, nor to contradict those which are plain."

And in C., R. I. & P. R. Co. v. Dodson, 25 Okla. 822, 107 Pac. 921, this court said:

"If there was a recognized custom or usage with reference to the payment by the railway company of the charges for compressing cotton, such charges being covered or included by the rate for transporting by the carrier of the compressed cotton, there being a question as to the particular meaning of the words 'uncompressed cotton, any quantity,' and 'compressed cotton, any quantity,' such custom is permissible to be proved as a matter of explanation of the meaning of such word as such in the tariff sheet."

In 12 Cyc. 1081, it is said:

"It is well settled that evidence of custom and usage is admissible to explain the meaning of a written instrument. * * *

"While words in a contract relating to the ordinary transaction of life are to be construed according to their plain, ordinary, and popular meaning, yet if, in reference to the subject-matter of the contract, particular words and expressions have by usage acquired a meaning different from their plain, ordinary, and popular meaning, the parties using those words in such a contract must be taken to have used them in their peculiar sense, and that sense may be fixed by parol evidence."

And on page 1082 the same author says:

"Words technical or ambiguous on their face, or foreign or peculiar to the sciences or the arts, or to particular trades, professions, occupations, or localities, are explainable where they are employed in written instruments by parol evidence of usage."

Many authorities could be cited supporting the doctrine announced above. Applying this rule to the petition here, the allegations presented the question of fact which, if true would give to the disputed word here the meaning contended for by the plaintiffs in error. While it is not urged, the allegations of the petition contain facts sufficient to show a deficiency in the cotton as to quality and quantity so as to justify a recovery upon the theory contended for by the defendant in error.

It follows that the trial court should not have sustained an objection to the introduction of this evidence, and the judgment of the lower court is therefore reversed, and this cause remanded for a new trial.