## CLEVELAND et al. v. MASCHO et al.

No. 10633—Opinion Filed May 9, 1922.

Rehearing Denied July 31, 1923.

(Syllabus.)

1. **Appeal and Error—Subsequent Appeals —Law of the Case.**

A decision on appeal to the highest court of a state upon questions of law becomes the law of the case; and, the facts or issues being substantially the same at a second trial thereof, such decision is controlling and is the law of the case in this court upon a second appeal

2. **Money Received—Right of Action.**

An action will lie to recover a sum certain whenever one has the money of another which he in equity and good conscience has no right to retain.

3. **Customs and Usages—Evidence—Admissibility.**

Where there is ambiguity or uncertainty as to the meaning of the terms used in the written agreement between the parties, usages and customs may be resorted to for the purpose of interpreting them, and to fix and explain the meaning of the expressions and words of doubtful and various meaning.

4. **Same—Parol Evidence.**

Words technical or ambiguous on their face, or foreign or peculiar to the sciences or arts, or to particular trades, professions, occupations, or localities, are explainable, where they are employed in written instruments, by parol evidence of usage.

5. **Same—Banks and Banking—Sufficiency of Evidence.**

Records examined, and held, that the trial court committed reversible error in (a) sustaining objection to the offer of testimony by the plaintiff, and (b) in sustaining the demurrer of the defendant to the evidence of the plaintiff.

Error from District Court, Lincoln County; Hal Johnson, Judge.

Action for money received by A. S. Cleveland and W. D. Cleveland, Jr., surviving partners and composing the firm of Wm. D. Cleveland & Son, against A. E. Mascho and the First National Bank of Chandler of Chandler, Okla. Judgment for defendant bank, and plaintiffs bring error. Reversed and remanded.

E. L. Fulton, for plaintiffs in error.

Ames, Chambers, Lowe & Richardson, for defendants in error.

JOHNSON, J. This is the second time this case has been before this court.

The position of the parties in the trial court and in this court on the former appeal and on this appeal was and is the same, and they will be referred to as plaintiffs and defendants, respectively, as they here appear.

The former appeal was from the judgment of the trial court sustaining the demurrer of the defendant bank to the petition of the plaintiffs.

There was no dispute as to the facts on the former appeal nor as to the facts on this appeal. The facts out of which this litigation arose, as stated in the former opinion in Cleveland et al. v. Mascho et al., 73 Oklahoma, 175 Pac. 927, and the questions of law therein determined were as follows:

"On the 24th day of March, 1914, one Mascho informed the plaintiffs in error by mail that he had to sell or ship 132 bales of good cotton, mostly white, in strictly M. M. M., and inquiring of it if it could sell it and the charges and differences in grades; to which on the 27th day of March, 1914, the plaintiffs in error replied. in substance, as follows:

" 'We have your postal of recent date to hand and thank you for it. * * * There is a good demand in this market for the better grades and a fair demand for all grades. * * * Our commission charge is $1 per bale and this charge covers all expenses for the first thirty days after the cotton arrives save the freight from your shipping point to Houston. After thirty days there is a charge of 10c per bale per month for storage, and the actual insurance which runs 20c per bale per month. * * * The enclosed letter explains our rates and conditions of advances. We have had no opportunity to become acquainted with you heretofore and therefore have no credit basis for our transactions. In the event you ship us and draw against the shipment please have your bank guarantee the conformity of your draft and shipment with the terms of our letter and against overdrafts; otherwise please give us information of your business, the name of your references, etc., that we may establish a basis for credit independent of the aid of others.'

"Together with this letter there was a communication which contained the following advice:

" 'Subject to change without notice, to meet changing markets and conditions, we

offer the following advances: For straight, white cotton, Middling and better, average 500℔, we will advance $40 per bale if shipped to be sold on arrival; or $35 if to be held. For grades running from Strict Good Ordinary to Strict Low Middling inclusive, average 500℔ in weight, we will advance $30 per bale if shipped to be sold on arrival. For grades below Strict Good Ordinary and for bollies pulled, perished or other irregular cottons we will make no advances, but we solicit consignments to be sold on arrival.'

"Thereafter, on April 16, 1914, Mascho wrote the plaintiffs in error as follows:

" 'I shipped you 132 bales Good Cotton except 6 bales not so good. * * * I have drawn on you for $40 and expect to sell within 30 days would like for you to try and sell it Hog. Get the best and wire me and if we sell it will wire you back.'

"And on April 15, 1914, the First National Bank of Chandler, by B. C. Love, cashier, wrote plaintiffs in error as follows:

" 'Mr. A. E. Mascho of this place is to-day drawing through this bank for $5,280. Attached to the draft is a bill of lading covering 132 bales of cotton. When the draft is presented we hope you will take care of same and upon arrival of the cotton if you find any of it that is not as represented we would be glad to have you draw on us for the amount with a statement attached. According to Macho's statement with the exception of one or two bales he is sure of your finding the list perfectly satisfactory.'

"And on the 17th day of April, 1914, the plaintiffs in error wired the First National Bank at Chandler, Okla., as follows: .

" 'Your letter received. Cannot pay Mascho's draft unless your bank guarantees against overdraft. Please wire quickly before draft reaches us. Writing.'

"On the same date plaintiffs in error communicated with said bank by letter as follows: . .

" 'We thank you cordially for your letter of the 16th inst., giving us notice of shipment of 132 bales of cotton by Mr. A. E. Mascho and draft for $5,280. We wired you night letter as follows and beg to confirm: "Letter received. Cannot pay Mascho draft unless your bank guarantees against overdraft. Please wire quickly before draft reaches us. Writing." The enclosed letter explains our rates and conditions of advances. We hope you will entrust the shipment to us when we shall exert ourselves to the utmost to please you and your customer. We wired your bank for a guarantee because your letter did not explicitly state a willingness to guarantee against overdrafts but may have been intended for that purpose. With cordial regards, we remain,

" 'Very truly yours,

" 'Wm. D. Cleveland & Sons.

" 'P. S. You failed to tell us in your letter whether you want the cotton held or sold upon arrival. Unless we hear from you to the contrary we shall presume you want the shipment sold and shall follow that course.'

"And on the 18th day of April, the First National Bank wired plaintiffs in error as follows: 'If Mascho overdrafts we will pay draft for the amount.'

"And on the 20th day of April the First National Bank wrote plaintiff as follows: 'Your letter of 17th inst, in regard to disposing of the 132 bales of cotton shipped you by A. E. Mascho of this place received. We are advised by Mr. Mascho that he wrote you several days ago about this. You no doubt have received his instructions by this time. In reply to your telegram of the 17 we wired you to draw on us for the amount of the overdraft if there be any and we now wish to confirm the same.'

"And on the 25th day of April, 1914, Mascho wrote plaintiff as follows:

" 'Received your card. In reply will say do not sell cotton until you hear from us; want to hold for about 30 days, except you have sold the very bad bales. Suppose it is better to get rid of the tough ones, but I did not tell you to sell only submit an estimate of its worth.'

"The plaintiffs in error instituted this suit in the lower court against Mascho and the bank to recover from Mascho, as principal, and from the bank, as guarantor, a balance for the advances made on this shipment of cotton.

"In the petition filed in this action it is alleged that plaintiffs are cotton factors at Houston, Tex., and that on March 24, 1914, Mascho wrote to it that he had 132 bales of cotton which he desired to sell, and asked the plaintiffs if they could handle the same, and if they could to send rates and grades and differences; and thereupon the plaintiffs in error replied by communication as stated above. And on the 15th day of April, 1914, Mascho accepted the proposal of the plaintiffs, and on said day shipped to them 132 bales of cotton and at the same time drew a draft on them for $5,280 through the First National Bank of Chandler, Okla. The correspondence, as detailed above, is all the correspondence which passed between the parties out of which this transaction arose. It is contended by the plaintiffs in error that, inasmuch as the letter of the bank to Mascho was not satisfactory, they wired the bank and received this communication from it which guaranteed the plaintiffs in error against any overdraft on said bank made by Mascho. It is further alleged in the petition that, at the time of said draft and guaranty, Mascho was indebted to the bank in the sum

of $7,000, and that the amount of said draft thus paid by the plaintiffs in error to Mascho was received by the bank and credited upon Mascho's indebtedness to it. It is further alleged that, at the time said guaranty was given, and for a long period of time prior thereto, a guarantee against overdrafts and a promise to pay overdrafts had a certain well-defined and well-understood meaning among cotton factors and cotton shippers and banks, and meant that in case cotton shipped to a factor for sale is drawn against and when sold should not bring enough to pay all charges and advances, the person making such guaranty, or promising to pay such overdraft, should pay the difference; and that the plaintiffs, relying on said guaranty thus made to it by the bank, paid said draft and the other charges incident to the handling of said cotton, and that when the same was sold there was a deficiency of $1,674.10, to recover which this action is instituted.

"Upon the trial of this cause in the lower court, an objection to the introduction of any evidence against the bank was sustained for the reason that the petition did not state facts sufficient to constitute a cause of action against it.

"It is not contended here that the act of the bank in making this guaranty was ultra vires; hence that question may be dismissed from our consideration.

"It may be safely said that the only issue in this case is the meaning and effect to be given to the word 'overdraft' as applied to the facts in this case. The plaintiffs in error contend that this correspondence constitutes a contract which is susceptible of but one interpretation, and that is that the bank bound itself to make good any shortage that might exist between the amounts advanced by the plaintiffs in error to the defendant Mascho and the net amount received by the plaintiffs in error from the sale of the cotton. While the bank contends that the extent of its guaranty was merely that the cotton, on its arrival at Houston, should prove to be as represented, and inasmuch as the plaintiffs in error did not bring this suit upon any theory that 'the cotton was not as represented, that no cause of action was stated.

"It appears from the examination of the record that in the first letter written by the bank to the plaintiffs in error the bank said: 'If you find any of it not as represented we would be glad to have you draw on us for the amount with the statement attached.'

"Thereupon the plaintiffs in error immediately wired the bank, in substance, that they would not pay the Mascho draft unless there was a guaranty against overdrafts, and advising it that, if the bank and Mascho expected the draft to be paid, a guaranty against overdrafts would have

to be given; and thereupon the bank wired, 'If Mascho overdraft we will pay draft for amount.'

"The bank contends that by the meaning of the word 'overdraft' as used by it, it merely intended to guarantee the conformity of the cotton with the representations of Mascho, and be responsible to the plaintiffs in error for any sum that it might advance in excess of the amount it agreed to advance; and it urges that the plaintiffs in error were willing to make advances upon shipments of cotton dependent upon the condition of the market at the time of the shipment, and that the bank was willing to guarantee the cotton shipped was in accordance with the representations of Mascho, and that he had shipped the number of bales shown by the draft, and it was willing and still is willing, to make good any difference that existed between the amounts plaintiffs in error agreed to advance and the draft drawn upon it. It is further urged by the bank that the limitation of the amount for advancement per bale is in itself a sufficient refutation of the contention now made by the plaintiffs in error, inasmuch as the correspondence shows that the plaintiffs in error were willing to advance only so much per bale if to be sold within a limited time and a less amount if to be sold at a longer time; and it is further urged that the correspondence indicates conclusively that the guaranty was a present one—that is, for a present default, if any—and not a continuing guaranty.

"We have carefully considered this record, and in our minds there are plausible reasons supporting the theories of either party to this action.

"However, in the petition of this action, it is alleged—'that at the time of the correspondence which passed between these parties a guaranty against overdraft or promise to pay overdraft had, and for a long time prior thereto had, a certain well-defined and well-understood meaning among cotton factors, cotton shippers and banks, and meant that in case cotton shipped to a factor for sale is drawn against, and when sold should not bring enough to pay the charges and advancements, that the person or persons making the guaranty or promising to pay the overdraft should pay the difference; and that said draft * * * was on the 18th day of April, 1914, in ordinary course of business, presented to the plaintiffs in error for payment, and the plaintiffs, relying on said guaranty and promise of the bank to pay any overdraft, paid the same in full.'

"This court in the case of Jones v. Cochran, 33 Okla. 431, 126 Pac. 716, said:

" 'The circumstances under which usages or customs may be resorted to for the purpose of interpreting a contract are well set-

tled. Such extrinsic aid cannot be resorted to when the contract is susceptible of a reasonable construction on its face. Mr. Greenleaf, upon this question, says: "Their true nature is to interpret the otherwise indeterminate intentions of the parties and to ascertain the nature of their contracts arising, not from express stipulation, but from mere implications and presumptions and acts of doubtful and equivocal character, and to fix and explain the meaning of the words and expressions of doubtful and various senses. * * *"

" The same author again says: "But though usage may be admissible to explain what is doubtful, it is not admissible to contradict what is plain."

" The same doctrine is expressed in Oelriche v. Ford, 23 How. 49, 16 L. Ed. 534, in the following language: "As a general rule, there must be ambiguity or uncertainty upon the face of the written instrument arising out of the terms used by the parties in order to justify the extraneous evidence, and when admissible, it must be limited in its effect to clearing up the obscurity. It is not admissible to add or ingraft upon the contract new stipulations, not to contradict those which are plain." '

"And in C., R. I. & P. R. Co. v. Dodson, 25 Okla. 822, 107 Pac. 921, this court said: 'If there was a recognized custom or usage with reference to the payment by the railway company of the charges for compressing cotton, such charges being covered or included by the rate for transporting by the carrier of the compressed cotton, there being a question as to the particular meaning of the words "Uncompressed cotton, any quantity" and "Compressed cotton, any quantity," such custom is permissible to be proved as a matter of explanation of the meaning of such word as such in the tariff sheet.'

"In 12 Cyc. 1081. it is said: 'It is well settled that evidence of custom and usage is admissible to explain the meaning of a written instrument. * * * While words in a contract relating to the ordinary transactions of life are to be construed according to their plain, ordinary, and popular meaning, yet, if, in reference to the subject-matter of the contract, particular words and expressions have by usage acquired a meaning different from their plain, ordinary, and popular meaning, the parties using those words in such a contract must be taken to have used them in their peculiar sense, and that sense may be fixed by parol evidence.'

"And on page 1082 the same author says: 'Words technical or ambiguous on their face, or foreign or peculiar to the sciences or the arts, or to particular trades, professions, occupations, or localities, are explainable where they are employed in written instruments by parol evidence of usage.'

"Many authorities could be cited supporting the doctrine announced above. Applying this rule to the petition here, the allegations presented the question of fact which, if true, would give to the disputed word here the meaning contended for by the plaintiffs in error. While it is not urged, the allegations of the petition contain facts sufficient to show a deficiency in the cotton as to quality and quantity so as to justify a recovery upon the theory contended for by the defendant in error.

"It follows that the trial court should not have sustained an objection to the introduction of this evidence, and the judgment of the lower court is therefore reversed, and this cause remanded for a new trial."

After the cause was remanded in pursuance of the former opinion of this court, the defendant bank filed an amended answer which contained an unverified general denial and the allegation that if the defendant bank did enter into a contract of guaranty set out in plaintiff's petition, it had no authority so to do, and its act was ultra vires and void.

To this answer the plaintiff's replied that the defendant had received the benefit of the contract, and was therefore estopped to deny liability.

The cause came on for trial as between the plaintiffs and defendant, and after the introduction of evidence on behalf of the plaintiffs the court sustained a demurrer thereto on the ground that the same did not prove facts sufficient to constitute a cause of action in favor of the plaintiffs, and against the defendant bank. The plaintiffs filed a timely motion for a new trial, which was overruled by the trial court, to reverse which judgment this proceeding in error was regularly commenced.

The evidence introduced on behalf of the plaintiffs was substantially as follows:

On March 24, 1914, the defendant Mascho wrote the plaintiffs as follows:

"We have to sell or ship to you for sale 132 bales of good cotton, mostly white, good in strict M. M. M. spotted. Tell me if you can sell it and your charges and differences in grades. Write me quick."

On March 27, 1914, plaintiffs replied to the above letter, giving the information asked for and then stated:

"In the event you ship us and draw against the shipment, please have your bank guarantee the conformity of your draft and shipments with the terms of our letter and against overdrafts."

With the foregoing letter was enclosed a circular explaining rates and conditions of advances, which were as follows:

"For straight white cotton middling or better, average 500 pounds, we will advance $40 per bale if shipped to be sold on arrival; or, $35, if to be held."

On April 16, 1914, the defendant Mascho shipped the cotton to plaintiffs, and on said date wrote the plaintiffs informing them of the shipment and that he had drawn a draft against the plaintiffs in favor of the defendant bank in the sum of $5,280. On April 15, 1914, the defendant bank wrote plaintiffs confirming the shipment and drawing of the draft, and then said:

"When the draft is presented we hope you will take care of same and upon arrival of the cotton, if you find any of it not as represented, we would be glad to have you draw back on us for the amount with a statement attached."

In answer to the foregoing letter the plaintiffs wired the defendant bank as follows:

"Your letter received. Cannot pay Mascho draft unless your bank guarantees against overdraft. Please write quickly before draft reaches me. Writing."

In answer to the foregoing telegram of the plaintiffs the defendant bank on April 17, 1914, wired plaintiffs as follows:

"If Mascho overdraft we will pay draft for the amount."

E. C. Love, cashier of the defendant bank at the time of the foregoing correspondence, testified on behalf of plaintiffs that at the time of, and prior to, such correspondence, the defendant, Mascho, was indebted to the defendant bank for money advanced for the purchase of cotton including the cotton in question in the sum of approximately $8,000, and that the bank received the amount of the draft drawn by the defendant Mascho on the plaintiffs and applied the same toward the payment of the indebtedness owing it by the defendant Mascho.

The defendant Mascho testified on behalf of the plaintiffs that at the time of the drawing of the draft and giving the guaranty in question he informed the defendant bank that he was shipping the cotton to be held for a period of at least 30 days. The plaintiffs also introduced in evidence their original petition, the amendment thereto, the answer of the defendant A. F. Mascho, the original answer of the defendant bank, the reply of the plaintiffs to answer of defendant Mascho, the instructions of the court to the jury at the first trial, and the judgment of the trial court at the last trial.

The plaintiffs also introduced in evidence the deposition of the plaintiff, A. S. Cleveland, who testified, among other things, that he was the senior member of the firm of Wm. Cleveland & Son; that said firm had been in the business of cotton factors since 1867; that he had been a member of the firm, and had had special supervision of the cotton department since 1896. The plaintiffs then attempted to prove by this witness the meaning of the word "overdraft" among cotton factors and cotton dealers in general, and the meaning the word had on the Houston market. After permitting the witness to testify generally on this question, the court on the objection of the defendant bank, refused to permit the witness to testify further. The testimony of this witness was as follows:

"Q. Mr. Cleveland, I notice in your letter to the defendant Mascho, Exhibit '2', under date of March 27, 1914, you state, among other things, as follows: 'In the event you ship us and draw against the shipment please have your bank guarantee the conformity of your draft and shipment with the terms of our letter and against overdraft.' I also notice in your telegram to the defendant bank you state, among other things, as follows: 'Cannot pay Mascho draft unless your bank guarantees against overdraft.' I also notice that in the original telegrams sent you by the bank, Exhibit '7,' it states: 'If Mascho overdraft, we will pay draft for the amount.' Now, from your experience as a cotton factor and your knowledge of the usages and customs which prevailed in that business, are you able to state whether or not the word 'overdraft' as used in this connection has any certain, specific, defined, and well-understood meaning among cotton factors and cotton dealers in general? Mr. Chambers: We object to that as incompetent, immaterial, and irrevelant and asking for a conclusion of the witness and attempting to change the terms of a written instrument. The Court: Objection overruled. Mr. Chambers: To which ruling the defendant excepts. A. It has. Q. You may state what that meaning was and is—now state what that meaning was? A. The meaning was this: It was the equivalent of a guarantee of the account and for this reason the bank * * * the bank guaranteed against overdraft. There was only one way to develop that overdraft, that was when the cotton was sold and the proceeds arrived at; if the proceeds from the sale of the cotton were less than the amount of the draft that we paid, then the overdraft would be developed and it couldn't be developed until the cotton was sold. Is that plain enough? Q. No, that isn't plain enough. * * * What I wanted to get at is, whether that word 'overdraft,' used in the connection which it was by you in these letters and by the bank in its telegrams, has any particular meaning among cotton factors and cotton dealers in Houston, Texas? Mr.

Chambers: We object to that as incompetent, irrevelant, and immaterial and not the best evidence and asking for an opinion and conclusion of the witness and attempting to change the terms of a written instrument. The Court: Objections sustained. Mr. Fulton: To which ruling of the court the plaintiffs except. Q. Please state fully what it means and how the word is understood to mean by the cotton trade in general. Mr. Chambers: Objected to as incompetent, irrelevant, and immaterial and not the best evidence and asking for an opinion and conclusion of the witness and attempting to change the terms of a written instrument. The Court: Objection sustained. Mr. Fulton: To which ruling of the court the plaintiffs except. Q. Does it only apply to the amount that you advance against it, or does it include your legitimate charges also? Mr. Chambers: Objected to as incompetent, irrelevant, and immaterial and not the best evidence and asking for an opinion and conclusion of the witness and attempting to change the terms of a written instrument. The Court: Objection sustained. Mr. Fulton: To which ruling of the court the plaintiff excepts. Q. Is it a word that is commonly and frequently used in cotton dealings? Mr. Chambers: We object as incompetent, irrelevant, and immaterial and asking for an opinion and conclusion of the witness and attempting to change the terms of a written instrument. The Court: Objection sustained. Mr. Fulton: To which ruling of the court the plaintiffs except. Q. That word means or implies that the cotton is to be sold at any particular time, or does it refer to cotton that is to be sold immediately upon arrival, or to cotton that is to be held or to either one? Mr. Chambers: We object to that as incompetent, irrelevant, and immaterial and not the best evidence and asking for an opinion and conclusion of the witness and attempting to change the terms of a written instrument. The Court: Objection sustained. Mr. Fulton: To which ruling of the court the plaintiffs except. Q. Now you say your company paid the full amount of this draft when it was presented? A. Yes. Q. Now at the time you paid it did you rely upon this interpretation upon this meaning of the word 'overdraft' as you have testified to? Mr. Chambers: We object as incompetent, irrelevant, and immaterial and not the best evidence and asking for a conclusion of the witness and attempting to change the terms of a written instrument. The Court: Objection sustained. Mr. Fulton: To which ruling of the court the plaintiffs except."

The plaintiffs also offered in evidence the depositions of the witnesses Victor Snyder, William Howard, and W. B. Chew to establish the same facts, excepting as to these witnesses the questions were directed to the meaning of the word "overdraft" on the Houston market.

It is admitted by counsel for plaintiffs in his brief that the contract of guaranty by the defendant bank was ultra vires, but he insists that the plaintiffs' cause of action is not based upon the contract itself, but is an action to recover from the bank the specific sum of $1,316.83, with six per cent. interest thereon from September 15, 1916, and costs of suit, the amount being the difference between the amount of the draft of $5,280 and the amount realized by the plaintiffs from the net proceeds of the sale of the cotton, and there is no testimony in the record disputing the correctness of the amount as shown by the itemized statement of the plaintiffs to the defendants, covering the entire transaction, which was as above.

It was clearly shown and not disputed by the cashier of the bank that the proceeds of the draft, $5,280, was received by the bank and credited to the general indebtedness by open account of the defendant Mascho to the bank, which was approximately $8,000.

In the case of Crowder State Bank v. Aetna Powder Co., 41 Okla. 394, 138 Pac. 382, this court held as follows:

"It may be considered as settled law in this state today that, when a corporation goes outside of its legitimate business and makes a contract and that contract is executed, and the corporation has received benefits of the contract, the courts will not listen to a plea of ultra vires. * * * When suit is brought on an ultra vires contract against a corporation, the contract being evidenced by a written instrument, the action is not maintained by virtue of the written instrument, but on the implied contract of the corporation to return the property delivered by virtue thereof, or to place the parties in status quo. To maintain such an action is not to affirm, but to disaffirm, the original or unlawful contract."

See, to the same effect, Shawnee National Bank v. Purcell Wholesale Gro. Co., 34 Okla. 34, 124 Pac. 613; First National Bank v. Womack, 56 Okla. 359, 156 Pac. 207; City National Bank v. Appleton, 216 U. S. 196, 54 L. Ed. 443; Oklahoma City National Bank v. Ezzard, 58 Okla. 251, 159 Pac. 267; Gilbert v. City National Bank, 61 Okla. 112, 160 Pac. 635.

The law of the case announced by this court on the former appeal thereof, as stated in syllabus, was as follows:

"1. Where there is ambiguity or uncertainty as to the meaning of the terms used in the written agreement between the parties, usages and customs may be resorted to for the purpose of interpreting them, and to fix and explain the meaning of the expressions and words of doubtful and various meaning.

"2. Words technical or ambiguous on their face, or foreign or peculiar to the sciences or arts, or to particular trades, professions, occupations, or localities, are explainable where they are employed in written instruments by parol evidence of usage.

"3. The petition in this case, examined, and it is held, that, under the allegations thereof, it was error to sustain an objection on the part of the bank to the introduction of evidence."

The law announced in the syllabus, supra, under the well-recognized doctrine of stare decisis, is the law of the case upon this appeal. Kingfisher Imp. Co. v. Talley, 51 Okla. 226, 151 Pac. 873; Corder v. Purcell, 50 Okla. 771, 151 Pac. 482; City of Ardmore v. Colbert, 52 Okla. 235, 152 Pac. 603; Courtney v. Gibson, 52 Okla. 769, 153 Pac. 677; Krauss v. Potts, 53 Okla. 379, 156 Pac 1162; C., R. I. & P. R. Co. v. Austin, 63 Okla. 169, 163 Pac. 517; First National Bank v. Brown, 62 Okla. 112, 162 Pac. 454.

This court held on the former appeal that the contract of guaranty made by the defendant bank to the plaintiff was ambiguous and was susceptible of either of two constructions, the one contended for by the plaintiffs or the one contended for by the defendant, and that oral testimony was admissible for the purpose of interpreting the terms of the contract and to fix and explain the meaning of the expression and words of doubtful and various meaning, and that it was reversible error under the allegations of the petition for the court to sustain the objection on the part of the bank to the introduction of evidence. Notwithstanding said holding by this court, that is precisely what the trial court did upon the second trial.

The witness, A. S. Cleveland, testified that the term "overdraft" had among cotton men, generally, a well defined meaning, according to the usage and custom which prevailed in that business when used in connection therewith, and that:

"It was the equivalent of a guarantee of the account and for this reason the bank * * * the bank guaranteed against overdraft. There was only one way to develop that overdraft, that was when the cotton was sold and the proceeds arrived at; if the proceeds from the sale of the cotton were less than the amount of the draft that we paid, then the overdraft would be developed and it couldn't be developed until the cotton was sold."

The plaintiff offered to show by this witness and Victor Snyder, William Howard and W. B. Chew, all experienced cotton dealers in Houston, Texas, that the word "overdraft" on the Houston market meant the same thing. Which testimony on the objection of the defendant bank was excluded by the trial court. This we think was error.

We think the testimony of the plaintiff, which was undisputed as to the meaning of the term "overdraft", generally, and the testimony excluded that the term had the same meaning on the Houston market, which on the demurrer of the defendant bank to the evidence of plaintiff must be taken as true, determined the bank's defense adversely to its contention, and therefore, that judgment of the trial court must be reversed.

HARRISON, C. J., and KENNAMER, COCHRAN, BRANSON, and MASON, JJ., concur.